Bruce D. WELLMAN, et al., Plaintiffs-Appellants, Cross-Appellees,

v.

Gordon H. FAULKNER, et al., Defendants-Appellees, Cross-Appellants.

Nos. 81–3060, 81–3061.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1982.

Decided Aug. 9, 1983.

William E. Marsh, Legal Services Org. of Ind., Indianapolis, Ind., for plaintiffs-appellants, cross-appellees.

David A. Arthur, Deputy Atty. Gen., Indianapolis, Ind., Martha Schatz Volk, Newby, Lewis, Kaminski & Jones, La Porte, Ind., for defendants-appellees, cross-appellants.

Before BAUER and CUDAHY, Circuit Judges, and WEICK, Senior Circuit Judge.*

* The Honorable Paul C. Weick, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

CUDAHY, Circuit Judge.

In these consolidated appeals we consider whether the conditions of imprisonment at the Indiana state prison at Michigan City meet constitutional standards. Plaintiffs challenge the adequacy of Michigan City's medical care, the condition of its physical plant, the level of violence, the amount of time prisoners must spend in their cells and certain prison procedures (or lack thereof) that allegedly heighten the level of tension in the prison. The district court found that the totality of conditions did not violate the eighth amendment but that certain specific constitutional violations were established. *Hendrix v. Faulkner,* 525 F.Supp. 435 (N.D. Ind.1981). We affirm the district court's finding regarding the totality of conditions, its findings of certain specific constitutional violations and the remedies it ordered. We also conclude, however, that plaintiffs have established that the medical care at Michigan City is inadequate by constitutional standards and we therefore reverse and remand for further proceedings to determine further appropriate relief.

The state cross-appeals from the district court's damage award. We vacate the award and remand for consideration of whether the plaintiffs established at trial the requisite personal liability of defendants. We affirm the district court's denial of damages to plaintiffs who did not establish the personal responsibility of defendants.

## Medical Care

When a state imposes imprisonment as a punishment for crime, it accepts the obligation to provide persons in its custody with a medical care system that meets minimal standards of adequacy. This obligation is enforceable in federal court, since inadequate medical care for prisoners violates the eighth amendment.[1] *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *id.* at 116 n. 13, 97

1. The eighth amendment is applicable to the state through the fourteenth amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

S.Ct. at 292 n. 13 ("denial of medical care is surely not part of the punishment which civilized nations may impose for crime.") (Stevens, J., dissenting). "When systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers." *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (Kaufman, C.J.). Further, the policy of deferring to the judgment of prison officials in matters of prison discipline and security does not usually apply in the context of medical care to the same degree as in other contexts. *Id.* at 54. Compare *Bell v. Wolfish,* 441 U.S. 520, 551 n. 32, 99 S.Ct. 1861, 1880 n. 32, 60 L.Ed.2d 447 (1979) (deferring to prison officials' judgment on means to control smuggling of money, drugs and weapons into prison).

■ With respect to medical care, plaintiffs can establish an eighth amendment violation only if they can prove that there has been a "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. at 104, 97 S.Ct. at 291. As a practical matter, "deliberate indifference" can be evidenced by "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or it can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980) (citation omitted), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). *See also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977).

■ In the instant case, we think the record contains sufficient evidence of repeated instances of negligent medical treatment together with evidence of general systemic deficiencies to establish that there is deliberate indifference to serious medical needs such that unnecessary suffering is inevitable. For example, two of the three physicians at Michigan City are recent immigrants from Vietnam and, unfortunately, their English language skills are such that they cannot communicate effectively with their patients. A physician's assistant at the prison testified "I've seen [the prisoners] come out storming mad because they do not understand them." Tr. at 662. Even the *defendants'* medical expert testified that he observed a "language barrier between the inmate and the physician on a number of occasions" and acknowledged that this problem could interfere with the quality and effectiveness of medical care. Tr. at 2152–53. An impenetrable language barrier between doctor and patient can readily lead to misdiagnoses and therefore unnecessary pain and suffering. This type of language problem which is uncorrected over a long period of time and as to which there is no prospect of alleviation, can contribute to unconstitutional deficiencies in medical care.

Nor has the state adequately staffed the psychiatric care component of Michigan City's medical care system. Treatment of the mental disorders of mentally disturbed inmates is a "serious medical need." *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Inmates v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977); *Finney v. Mabry,* 534 F.Supp. 1026, 1037 (E.D. Ark.1982). At Michigan City, however, the position of staff psychiatrist has been unfilled for over two years, and there seems to be no prospect of filling it. *Defendants'* medical expert saw this as "[t]he most obvious serious deficiency in health care at Indiana State Prison" because "without an on-site psychiatrist there is no one qualified to evaluate and treat psychiatric emergencies such as suicide and homicide candidates, or to follow patients who need to be maintained on long term psychotropic medications." DX HHH at 13. Maintenance on long term psychotropic medications enables patients to avoid the unnecessary suffering of acute episodes of mental illness. Without such care, repeated acute episodes can be predicted.[2] Tr. at 1002–03. As plain-

---

2. Plaintiffs' psychiatric expert testified that,    "[g]enerally, the occurrence of repeated epi-

tiffs' psychiatric expert explained, a psychiatrist is needed to supervise long term maintenance because "[a] regular physician, that is a non-psychiatric physician is not really in a position to perform the evaluation to make decisions about drug dosage that would require the services of a psychiatrist." Tr. at 1003.[3]

The district court recognized the importance of on-site care, but decided against finding an eighth amendment violation in part because a psychiatric position was authorized for the prison and prison officials had been trying for two years to fill it. We think this circumstance may weigh more heavily against the state than for it, since the position has remained vacant for two years and the authorized salary is, in the district court's words, "woefully inadequate." Despite the apparent good intentions of prison officials, there seems to be no foreseeable cure for this serious systemic deficiency.

In addition, plaintiffs showed many individual instances of medical maltreatment, including several that the district court found constituted eighth amendment violations in and of themselves and for which the district court awarded damages. For example, James Hendrix was denied treatment for a stomach problem for two years, Melon Carroll was denied treatment for a painful abscess for five years and Grady Bobbitt was denied treatment for a dental problem for two years. The district court found that, "[t]hese individuals endured for extended periods of time a systematic failure to receive treatment, even though their ailments were made known." Order of November 25, 1981, Defendants-Appellees' Appendix at 97.

In addition, there was a good deal of evidence about the seemingly inadequate medical care received by James Stubblefield, who died of heart failure at age 47. Mr. Stubblefield first came to the prison infirmary at 3:00 PM on February 9, 1979, and complained of chest pains. His blood pressure and pulse were checked and he was sent back to his cell. By 6:00 PM, Mr. Stubblefield returned to the infirmary again complaining of chest pain. He appeared to be in "severe distress" and had trouble breathing. PX 88. Nevertheless, no physician came to check on Stubblefield. A prison doctor was called by telephone and he prescribed a mild tranquilizer. Stubblefield was then admitted to the prison infirmary. By 7:30 PM, Stubblefield's blood pressure had dropped to 60/40 and his pulse was irregular. Plaintiffs' medical expert and defendants' medical expert agreed that Stubblefield "had suffered some type of cardiovascular catastrophe at that point." "He was in cardiovascular shock." Tr. at 2120, 2121. Still no doctor came to see Stubblefield. At 9:45 PM, Stubblefield's blood pressure was still only 60/40 and his pulse rate was up to 120 beats per minute. The infirmary progress notes state, "request [the doctor] to come in again and again he declined." PX 88. Finally, after four attempts to get [the doctor] to see Stubblefield, the infirmary called a second prison doctor. This doctor prescribed some medication for Stubblefield, though he did not order that Stubblefield be sent to the hospital until midnight, nine hours after Stubblefield had begun alerting the prison personnel to his chest pain.

Plaintiffs' medical expert testified that there "were very serious deficiencies in the care of Mr. Stubblefield." Tr. at 755. Defendants' medical expert did not dispute this conclusion. See Tr. at 2119–23. Instead, defendants' medical expert testified

---

sodes during which such an individual becomes floridly psychotic is accompanied by a progressive deterioration in psychological and intellectual functioning which leads to more and more serious impairment of that person's capability of adjustment." Tr. at 1004.

**3.** Warden Duckworth testified that hiring a psychiatrist was the single greatest need he saw for the prison. A psychiatrist would not only be beneficial to the mentally ill patients themselves but would also benefit the rest of the inmates because the mentally ill patients make life less bearable for the majority. Tr. at 2340. Warden Duckworth explained that he has been unable to hire a psychiatrist because the authorized salary is too low and he cannot do anything about raising it.

that the modern treatment for cardiovascular shock is to place the patient in an intensive care unit. Yet five hours passed from the time Stubblefield was obviously in cardiovascular shock and the time he was finally taken to the hospital. He died the following day.

There also have been very disturbing problems in stocking necessary medical supplies. Tr. 639–40. One of the more distressing instances of this problem is the prison's apparently continuing difficulty in stocking disposable waste-collection bags for inmates who have had a colostomy. These inmates have been forced to wash out and re-use bags that are designed for single-use. A physician's assistant at the prison explained why this practice literally stank: "It's very foul smelling for one, causes problems in the cells next to the inmates. The seals on these are only designed to be used once so they do not seal properly afterwards. They do not drain correctly after being used." Tr. at 640.

Therefore, given the gross deficiencies in staffing, the shocking delays in treatment and the ongoing severe problems in stocking needed supplies, we think plaintiffs have established that there is a deliberate indifference to serious medical needs of prisoners at Michigan City such that a great deal of unnecessary suffering is inevitable. We, of course, recognize that many of these appalling medical deficiencies are closely related to the lack of funds to support these activities. We understand that prison officials do not set funding levels for the prison. But, as a matter of constitutional law, a certain minimum level of medical service must be maintained to avoid the imposition of cruel and unusual punishment.

### Overcrowding

Defendants appeal from the district court's holding that Michigan City is unconstitutionally overcrowded: "[t]he most serious problem at the prison is simple overcrowding. Given the nature and age of the physical plant it is pervasive and cuts across all other issues here. Given the most generous application of judicial restraint it raises serious Eighth Amendment problems. In the context of the physical plant and the limits on staffing this overcrowding constitutes a violation of the Eighth Amendment of the Constitution of the United States. This Court reaches this conclusion with greatest reluctance but the facts compel the conclusion." *Hendrix*, 525 F.Supp. at 527. Accordingly, the district court ordered a two-stage reduction in population from 1950 inmates at time of trial to 1750 inmates by December 31, 1982 and to 1615 inmates by December 31, 1983.

■ We think the district court's conclusion is broadly supported by the Record. Michigan City's physical plant is more than one hundred years old. Given its age, it is not surprising that there are problems with plumbing, electrical wiring and rodent and insect infestation. Routine maintenance in the cells, corridors and main food service area is deficient. As discussed above, the medical care system makes unnecessary suffering inevitable, and overcrowding simply heightens this pain. Overcrowding also has resulted in extremely limited time for outside recreation and unreasonable periods of time some prisoners must spend locked in exceedingly cramped cells. For example, prisoners in the A & O Unit have been spending between 22 and 23½ hours per day in their cells, although the cells' floor space *only amounts to 17 square feet*. There was testimony that some inmates have not had outside recreation in five months. There has also been an extreme shortage of prison personnel in recent years. Hence, we agree with the district court that at current population levels Michigan City's physical and personnel resources are so overtaxed that unnecessary suffering is serious and inevitable.

### Other Conditions of Confinement

Various prison conditions do not exist in isolation. Rather, challenged conditions must be viewed in the light of other prison conditions that may aggravate or mitigate the effect of the challenged conditions. For example, "the constitutionality of double-celling involves an assessment of many fac-

tors, including, *inter alia,* the duration of the confinement, the size of the cells and the opportunities for inmates to leave their cells during the normal prison routine." *Madyun v. Thompson,* 657 F.2d 868, 872 n. 5 (7th Cir.1981). *See Ruiz v. Estelle,* 679 F.2d 1115, 1139–40 (5th Cir.), *modified,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Villanueva v. George,* 659 F.2d 851, 854 (8th Cir.1981) (en banc). *See also Smith v. Fairman,* 690 F.2d 122, 125 (7th Cir.1982). At the same time, "otherwise unquestionably constitutional conditions [do not] become unconstitutional by their aggregation." *Madyun,* 657 F.2d at 874 n. 10. *But see Rhodes v. Chapman,* 452 U.S. 337, 362–63, 101 S.Ct. 2392, 2407–08, 69 L.Ed.2d 59 (Brennan, J., concurring).

With these standards in mind, we have reviewed the evidence respecting plaintiffs' challenges to the prison's physical environment, the level of violence and several prison practices that are alleged to create unnecessary tension in the institution.[4] Based on this review, we cannot say that the district court erred in determining that these conditions of confinement were insufficient to establish further eighth amendment violations.

### Damages

Plaintiffs appeal from the district court's denial of damages to the named plaintiffs in 81–3060. Defendants cross-appeal from the district court's award of five hundred dollars each to plaintiffs Hendrix and Bobbitt and one thousand dollars to plaintiff Carroll. Damages were awarded to these plaintiffs in 81–3061 for specific instances of medical maltreatment—these prisoners were denied adequate medical care for several years—and not for the general deficiencies in medical facilities and personnel. Defendants contend that none of the plain-

tiffs in 81–3060 or in 81–3061 presented at trial any evidence of personal involvement, knowledge or acquiescence in these denials of medical care by any of the named defendants. *See Adams v. Pate,* 445 F.2d 105 (7th Cir.1971). The named defendants are the Warden, the Commissioner and the Director of Classification and Treatment.[5]

■ To recover damages under 42 U.S.C. § 1983, a plaintiff must establish a defendant's personal responsibility for the claimed deprivation of a constitutional right. *Duncan v. Duckworth,* 644 F.2d 653, 655 (7th Cir.1981). The personal responsibility requirement is satisfied "if the official acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982).

We consider first the plaintiffs' argument for a modification, based on several of our cases, in the procedural requirements for proving defendants' personal responsibility. Thus, several of our cases have held that, under some circumstances, the responsibility of senior prison officials can be assumed at the pleading stage, pending discovery of those who were directly responsible for whatever deprivation may have occurred. *Duncan,* 644 F.2d 653, 655; *Chavis v. Rowe,* 643 F.2d 1281, 1290 n. 9 (7th Cir.), *cert. denied,* 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981). Plaintiffs argue that this rule should be applied and extended in the case before us so that a named defendant's liability may be presumed until the defendant identifies who was directly responsible if the named defendant was not. "If those officials so named or called to testify all remain silent as to the persons responsible for the deprivations and such information is in the hands of defendants but not necessarily discoverable by plain-

---

4. Plaintiffs argue that "unnecessary tension in the institution is created by arbitrary and racially harassing body cavity searches, harassment of visitors, illegal interference with inmate mail, frequent mismanagement of inmates' property coupled with an inadequate grievance system, unsafe work locations and arbitrary and capricious disciplinary procedures." Plaintiffs-Appellants' Brief at 10–11.

5. The "treatment" referred to in Edward Jones' job title apparently does not mean medical treatment. *See* Tr. at 1953–91.

tiffs, then liability should attach to those officials who are in a position to know but, through a conspiracy of silence, do not disclose that information." Plaintiffs-Appellants' Reply Brief at 23.

This argument is similar to one that carried the day for the plaintiff in *Ybarra v. Spangard,* 25 Cal.2d 486, 154 P.2d 687 (1944). Mr. Ybarra suffered an injury of unknown origin to his shoulder between the time he was anesthetized for an appendectomy and the time he awoke in the recovery room. Ybarra argued that res ipsa loquitur should be applied against all of the doctors and hospital employees connected with the operation, though presumably not all of them were responsible. The defendants argued that they were entitled to a dismissal because the plaintiff had not shown which of the defendants was responsible for his injury. The California Supreme Court held that Ybarra could proceed to trial because under the circumstances it was appropriate to place the burden of initial explanation for the injury on the defendants. At the subsequent trial, each of the testifying defendants denied seeing anything occur that could have caused the injury to the plaintiff. The trial court held, however, that this evidence did not overcome the plaintiff's prima facie case and entered judgment against all the defendants. The California appellate court affirmed the judgment. *Ybarra v. Spangard,* 93 Cal.App.2d 43, 208 P.2d 445 (1949) ("*Ybarra II*").

The principal basis for applying res ipsa loquitur in *Ybarra* apparently was the special circumstances of the medical personnel-patient relationship. "The basis of the decision appears quite definitely to have been the special responsibility for the plaintiff's safety undertaken by everyone concerned." W. Prosser, HANDBOOK OF THE LAW OF TORTS 223 (4th ed. 1971). If so, *Ybarra* is analogous to the case before us insofar as prison authorities have a special responsibility to inmates who are totally dependent upon them to receive medical treatment. *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. *Ybarra* is, however, not analogous to the degree that these plaintiffs, unlike Ybarra, were not unconscious at the time they suffered the alleged injuries.

■ Considering all relevant factors, we do not think it appropriate in the case before us to extend, in the fashion of *Ybarra II,* the presumption of senior prison official responsibility beyond the pleading stage. *See Duncan,* 644 F.2d 653. Unlike *Ybarra,* the defendants here are not the individuals who were immediately responsible for plaintiffs' care. Also, unlike *Ybarra* in which the standard of liability was mere negligence, in the instant case negligence would not be enough, *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. We are reluctant under these facts to presume a higher degree of culpability. Finally, although prisoners are to some extent handicapped in identifying who precisely is responsible for their maltreatment, we cannot say that they are so limited in their access to information that the burden of explanation should be shifted to defendants beyond the point indicated in *Duncan,* 644 F.2d 653. We confront the problem here after trial, when through discovery and otherwise, there should have been an opportunity to identify the directly culpable parties. As indicated above different considerations would apply on a motion to dismiss or otherwise early in the proceedings.

We next consider plaintiffs' entitlement to damages under the existing standards. With respect to the plaintiffs in 81–3060, the district court denied them damages because they had not shown that any of the named defendants were responsible for the injuries they suffered. *Hendrix,* 525 F.Supp. at 447, 450, 454, 457, 459 and 463. Having reviewed the evidence and plaintiffs' arguments, we cannot conclude that the district court erred in finding that the personal responsibility requirements of *Adams v. Pate,* 445 F.2d 105, and its progeny were not satisfied. Of course, the same principles governing personal responsibility apply to the medical claims of these plaintiffs as to the claims of Hendrix, Bobbitt and Carroll, explained below, and the district court, if appropriate, may consider this on remand.

With respect to those plaintiffs in 81–3061 who were awarded damages (Messrs. Hendrix, Bobbitt and Carroll), we vacate the awards and remand for clarification and appropriate disposition. The district court, in its post-trial Order, stated with respect to Hendrix, Bobbitt and Carroll:

These individuals endured for extended periods of time a systematic failure to receive treatment, even though their ailments were made known.

Order of November 25, 1981, Defendants-Appellees' Appendix at 97. This statement of the district court can be read as suggesting that some or all of the named defendants knew of and acquiesced in the nontreatment of these plaintiffs so that there may be an "affirmative link" between the defendants and the constitutional violation. *See Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). After making this statement, however, the district court cited *Duncan v. Duckworth,* 644 F.2d 653 (7th Cir. 1981). As we discussed above, exclusive reliance on *Duncan* to establish liability of persons having no "affirmative link" to the constitutional violation would be inappropriate in this case after trial on the merits. On the other hand, there may be a connection through "systematic" conditions for which senior prison officials may have been responsible. Presumably, the latter circumstance would involve problems of proximate cause which we are not now in a position to evaluate. Thus, we vacate the award and remand for clarification of the plaintiffs' entitlement to damages under *Adams v. Pate,* 445 F.2d 105, and its progeny.

### Costs

 The district court held that each party should bear its own costs. This court follows the general rule about the award of costs, namely, that there is a presumption in favor of awarding costs to the prevailing party. *Popeil Brothers, Inc. v. Schick Electric, Inc.,* 516 F.2d 772, 774–75 (7th Cir. 1975). To prevent an award of costs, the losing party must overcome the presumption. *Id.* at 775.

In light of the additional relief we have ordered herein, we vacate the district court's order and remand for a determination by the district court whether costs should not now be awarded to plaintiffs. *See* 6 J. Moore, W. Taggart & J. Wicker, MOORE'S FEDERAL PRACTICE ¶ 54.70 (2d ed. 1982).

The cause is affirmed in part, vacated in part and remanded for further proceedings in accordance with this opinion.