**Eugene Keith SULIE, Plaintiff,**

v.

**Jack R. DUCKWORTH, Defendant.**

No. S 79–1.

United States District Court,
N.D. Indiana,
South Bend Division.

April 5, 1984.

Eugene Keith Sulie, pro se.

Linley E. Pearson, Atty. Gen. of Ind., Indianapolis, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This action was filed pursuant to 42 U.S.C. § 1983 by an inmate at the Indiana State Prison in Michigan City, Indiana, against the former Governor of the State of Indiana, the Commissioner of the Indiana Department of Correction, and the Superintendent of the Indiana State Prison. Jurisdiction over the claims presented is predicated on a federal civil rights question under 28 U.S.C. §§ 1331, 1343. This matter was tried before the court sitting without a jury at the Indiana State Prison on January 4, 1984. At the conclusion of all of the evidence, the parties were ordered to file and exchange briefs by February 6, 1984. Both sides having done so, this matter is now ripe for ruling. In accord with the dictates of F.R.Civ.P. 52(a), this decision by memorandum and order constitutes this court's findings of fact and conclusions of law.

### I.

This action was originally filed on January 8, 1979. In his complaint, plaintiff protested the manner in which he had been administratively housed and treated upon his arrival at the Prison in December of 1976. Plaintiff contended that said treatment constituted a violation of his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment right to due process of law.

On January 18, 1979, plaintiff's complaint was dismissed without prejudice on the grounds of lack of specificity in the complaint, with plaintiff being given to and including March 5, 1979, in which to amend his complaint and replead. On March 12, 1979, plaintiff filed a letter purporting to request an enlargement of the time in which to replead. That motion was granted the following day, with the plaintiff being given to and including April 16, 1979, in which to file an amended complaint.

On April 16, 1979, plaintiff again contacted this court via letter, requesting an additional thirty days in which to file his amended complaint. That request was granted on April 17, 1979.

On May 18, 1979, plaintiff filed what appeared to be a second amended complaint with a motion to consolidate(?). In that amended complaint, plaintiff had deleted the former Governor of the State of Indiana and the Commissioner of the Indiana Department of Correction as party defendants, leaving only Jack R. Duckworth, The Superintendent of the Indiana State Prison, in as a defendant. Defendant Duckworth thereupon filed a Motion to Strike or, in the Alternative, Motion to Dismiss, arguing that plaintiff had still failed to allege any wrongdoing on his part. Plaintiff filed no response or objection to said motion.

On November 20, 1979, this court dismissed plaintiff's case for the reason that plaintiff had again failed to allege any personal wrongdoing on the part of defendant Duckworth, and that no cognizable claim was therefore stated.

On December 5, 1979, plaintiff filed his Notice of Appeal. In said appeal, plaintiff added the former Governor of the State of Indiana and the Commissioner of the Indiana Department of Correction as party defendants back to the caption of his complaint.

On April 8, 1982, the Court of Appeals affirmed in part, reversed in part and remanded plaintiff's action in an unpublished order. Specifically, the Court of Appeals remanded the case solely on plaintiff's Fourteenth Amendment due process claim. Although agreeing with this court that plaintiff had failed to allege any personal wrongdoing on the part of any named defendant, the Court of Appeals found that plaintiff had alleged enough generally to survive dismissal under the liberal reading requirements of *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and *Duncan v. Duckworth*, 644 F.2d 653 (7th Cir.1981).

As already noted, this matter came on for a bench trial at the Indiana State Prison on January 4, 1984. Plaintiff, who had not requested appointed counsel under 28 U.S.C. § 1915(d), proceeded pro se. At the

conclusion of the evidence, defendants Otis Bowen, M.D., and Gordon H. Faulkner (respectively, the former Governor of the State of Indiana and the Commissioner of the Indiana Department of Correction) were ordered dismissed because plaintiff had neither alleged nor proven any wrongdoing on their part. This court turns now to an examination of the merits of plaintiff's claim.

## II.

The evidence produced at trial revealed the following: On December 16, 1976, the plaintiff was sentenced to a term of life imprisonment for murder by a Lake County, Indiana, court. At that time, criminal defendants in Indiana convicted of a felony and receiving a sentence of less than life imprisonment were sent to a correctional institution via the Reception and Diagnostic Center (RDC) in Plainfield, Indiana. At the RDC, a prisoner was diagnosed and evaluated for eventual placement in one of many institutions in the Indiana correctional system. Persons receiving a life sentence, however, were sent directly to the Indiana State Prison as the State's only maximum security institution, thus bypassing the RDC. In this case, the plaintiff was transferred from Lake County directly to the Prison on December 17, 1976.

Upon his arrival at the Prison the plaintiff was housed in a cell block unit then known as "D-Seclusion". D-Seclusion consisted of one lower range of cells in D-Cell House, which housed part of the general population at the Prison. D-Seclusion was separated from the rest of D-Cell house by wire fencing. Inmates in this area were single-celled.

During 1976 and 1977, all new arrivals at the Prison went through a process of admission and orientation before placement in the general population. During this period, an inmate was evaluated for eventual work assignments and housing and was instructed on Prison policies and procedures. This process lasted for an average period of approximately two weeks, and new arrivals undergoing this process were normally housed in the Admissions and Orientation Unit (A & O). The A & O unit was separated from the general population in the prison and was located directly over the administration building.

Due to the limited amount of space in the A & O unit, however, new arrivals at the Prison were often housed in D-Seclusion during the admission and orientation process. During late 1976 and early 1977, D-Seclusion was used to house A & O overflow, self lockup inmates, medical layovers, and inmates serving short-term disciplinary segregation. At any given time during this period, inmates serving short-term disciplinary segregation might also be housed in A & O. As an inmate entered the Prison, the initial decision as to which area to house that prisoner was made by the institution's classification director. The decision as to where a particular inmate would be housed in the prison and his work assignment upon entering the general population was made by the institution's classification committee. Defendant Duckworth, who became Superintendent in early December of 1976, did not participate in either of these decisions.

In general, the conditions of confinement for inmates housed in D-Seclusion rather than the A & O unit were not different than those in A & O unit. A new arrival housed in D-Seclusion received the benefit of the normal admissions and orientation process and possessed commissary privileges similar to inmates housed on A & O. Both units were segregated from the general population.

In the plaintiff's case, testimony and exhibits at trial revealed that he was placed in D-Seclusion upon his arrival at the Prison on December 17, 1976. He remained there until January 20, 1977, when he appeared before the classification committee. On that date, the classification committee authorized his transfer to the general population. While the normal admission and orientation process lasted approximately two weeks, the plaintiff's stay in D-Seclusion for this purpose was lengthened due to a general lock-down of the entire Prison

which occurred at some point shortly after Christmas in 1976. The lock-down was the result of the murder of a prison employee and lasted for approximately two weeks. During the lock-down period, inter-institutional transfers were prohibited and meals were limited to two a day. The plaintiff testified, however, that meals in the A & O unit were served three times a day.

The plaintiff principally complains that he was placed in disciplinary segregation without notice of charges against him or a hearing in which to challenge this segregation. The plaintiff's entire disciplinary record, however, placed into evidence by the defendant, notably lacks any reference to disciplinary action taken or disciplinary reason for his initial incarceration in D-Seclusion. Defendant Duckworth testified that the plaintiff suffers from no disability with regard to his participation in prison programs, his parole date, or time earning class as a result of his stay in D-Seclusion. He further noted that the plaintiff, based on his past institution record, is not considered to be a disciplinary problem.

Testimony and documentary evidence presented at trial further revealed that the plaintiff entered the Prison with a notable history of psychotic illness. Documents placed in his institution packet at or near the time of his arrival at the Prison reflect that the plaintiff was charged with a murder in 1950. From 1950–1954, he was incarcerated in the Indiana Hospital for Insane Criminals. In 1954, he was placed in the Norman Beatty Hospital, a mental institution located in Westville, Indiana and was released in 1968. The plaintiff testified he raised insanity as a defense in the trial leading to his present incarceration. As a possible alternative reason for the plaintiff's stay in D-Seclusion, defendant Duckworth noted that it was not unlikely that an inmate having an extensive psychiatric history, such as that of the plaintiff, would be housed in D-Seclusion for psychiatric observation during the complained-of period.

## III.

■ To recover damages under 42 U.S.C. § 1983, a plaintiff *must* establish a defendant's personal responsibility for a claimed deprivation of his constitutional rights. *Wellman v. Faulkner* et al, 715 F.2d 269, 275 (7th Cir.1983), *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir.1981). This requirement is satisfied only "if [the defendant] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the constitutional deprivation occurs at [defendant's] direction or with [defendant's] knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir.1982).

■ With respect to the liability of supervisory officials in a § 1983 action, a plaintiff must show a causal connection, or "affirmative link," between such an official and the conduct complained of. *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); See *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983). This prerequisite has recently been recognized by the Seventh Circuit in the prison context in the case of *Wellman v. Faulkner et al., supra.* In *Wellman,* the Commissioner of the Indiana Department of Correction, Superintendent and Director of Classification at the Indiana State Prison cross-appealed from a damage award entered against them in a suit challenging various conditions at the Indiana State Prison. In that case, the district court had held that the cross-appellants were liable to certain plaintiffs for specific instances of inadequate medical care. *Hendrix v. Faulkner*, 525 F.Supp. 435 (N.D.Ind.1981).

In reversing and remanding that part of the district court's order awarding damages, the Court of Appeals rejected the notion that the liberality afforded to *pro se* inmate complaints in pleading personal involvement, as expressed in *Duncan v. Duckworth, supra,* should be extended to the trial stage. In *Duncan,* the Court of Appeals held that the personal involvement of supervisory officials could be assumed at the pleading stage, pending discovery of those who bore direct responsibility for an

alleged constitutional deprivation. 644 F.2d 653, 655. In rejecting plaintiff's argument that *Duncan* should be extended to the trial stage, the Court of Appeals stated that

> ... although prisoners are to some extent handicapped in identifying who precisely is responsible for their maltreatment, we cannot say that they are so limited in their access to information that the burden of explanation should be shifted to defendants beyond the point indicated in *Duncan*, 644 F.2d 653.
>
> \* \* \* \* \* \*
>
> ... [E]xclusive reliance on *Duncan* to establish liability of persons having no "affirmative link" to the constitutional violation would be inappropriate in this case after trial on the merits. On the other hand, there may be a connection through "systematic" conditions for which senior prison officials may have been responsible. Presumably, the latter circumstance would involve problems of proximate cause which we are not now in a position to evaluate.

715 F.2d at 276–277.

■ The lesson of *Wellman* is that although responsibility of a senior prison official may be presumed at the pleading stage in a civil rights action, a plaintiff still carries the burden of proof at trial to establish that such an official was a proximate cause of an alleged constitutional deprivation. This requirement preserves the effect of those cases holding that liability under 42 U.S.C. § 1983 may not be premised on a theory of *respondeat superior*. *See Duncan, supra, Adams v. Pate*, 445 F.2d 105 (7th Cir.1971).

■ In this case, the plaintiff presented no evidence that would in any manner establish an "affirmative link" between the conduct of defendant Duckworth and the constitutional deprivation complained of. The plaintiff testified that he had no contact with the defendant, either oral or written, from the time that he entered D-Seclusion until he was transferred to the Prison's general population by action of the classification committee. Defendant Duckworth confirmed this fact in his testimony, stating that the initial decisions as to where an inmate would be housed were made by the classification department. Defendant Duckworth did not participate in this decision.

The testimony of defendant Duckworth further revealed that he was only appointed as Superintendent at the Prison approximately one week prior to plaintiff's entrance into the Prison. Defendant Duckworth had no direct recollection of the plaintiff's admission to the Prison and the facts surrounding that entrance, and testified from his memory of general conditions existing at the prison in late 1976 and 1977. The record is devoid of any evidence which would provide an "affirmative link" between his conduct and the constitutional deprivation alleged by the plaintiff.

■ However, and even assuming, *arguendo*, that the plaintiff has shown sufficient personal involvement of defendant Duckworth, his due process claim fails on the merits. When considering a due process claim, a court must engage in a two-step process: first, there must be a determination that a sufficient liberty interest is involved to invoke application of the Due Process Clause; and second, assuming the first inquiry is answered in the affirmative, a court must determine what process is due.

■ A decision as to whether the Due Process Clause is applicable in any given case must naturally depend on the nature of the interest involved and must be considered on a case-by-case basis. The Due Process Clause applies if there is a legitimate expectation on the part of a plaintiff that something will not occur absent specified events. Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of a state. See, e.g., *Meachum v. Fano*, 427 U.S. 215, 223–227, 96 S.Ct. 2532, 2537–39, 49 L.Ed.2d 451 (1976).

■ In this case, the plaintiff alleges that he was placed in disciplinary segrega-

tion for approximately five weeks without a hearing or formal notification of charges against him. It cannot be disputed that if the plaintiff had been segregated for disciplinary reasons, procedural due process rights would at least be implicated. *See, Hughes v. Rowe,* 449 U.S. 5, 11–12, 101 S.Ct. 173, 176–77, 66 L.Ed.2d 163 (1981); *Hayes v. Walker,* 555 F.2d 625, 633 (7th Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). However, the record is devoid of any evidence indicating that the plaintiff was placed in "disciplinary" segregation or administratively "punished" in any way. In fact, defendant's evidence established that it was more likely than not that the plaintiff was placed in D-Seclusion for wholly non-disciplinary reasons. The plaintiff's segregated status was necessitated for either of two reasons: (1) The A & O unit was full, or (2) plaintiff's history of mental illness prior to his incarceration required observation in an area more suitable for that purpose. In either case, the plaintiff did not establish that his conditions of confinement or his treatment in D-Seclusion were substantially different than they would have been had he been placed in A & O. As already noted, both units were segregated from the general population.

It is apparent from the evidence presented at trial that the plaintiff was placed in segregation solely for administrative rather than disciplinary reasons. The applicability of the Due Process Clause to inmates so confined was recently considered by the Supreme Court in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court held that the reduction of liberty inherent in this type of confinement was not in itself sufficient to invoke Due Process Clause protection, noting that "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." 459 U.S. at 468, 103 S.Ct. at 870. Nevertheless, the Court acknowledged that a state could create a liberty interest protected by the Due Process Clause through its enactment of statutory regulatory measures.

*Id.,* citing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam). Where State law, policy, or practice creates a reasonable expectation that administrative segregation will not occur absent specified events, the Due Process Clause will require procedural safeguards.

In *Love v. Duckworth,* 554 F.Supp. 1067 (N.D.Ind.1983), this court had occasion to address the issue whether Indiana has created a protected liberty interest with regard to the decision to transfer an inmate to segregation for administrative reasons. In *Love,* the plaintiff, incarcerated at the Indiana State Prison, was held in administrative segregation pending the outcome of State criminal charges placed against him for his role in a kidnapping which occurred at the Prison. The plaintiff brought suit against, among others, the defendant in this case, alleging that he improperly applied Department of Correction guidelines and procedural policy in placing the plaintiff in administrative segregation. 554 F.Supp. at 1068.

After a bench trial at the Prison, and upon consideration of Indiana statutes, regulations and Prison policy and guidelines dealing with placement into administrative segregation, this court found in *Love* that "there is no legitimate expectation that an offender will remain in the general population of the Prison absent the finding of particular events." 554 F.Supp. at 1070. This court further noted that:

The Administrative Segregation philosophy ... is for all practical and legal purposes identical to the basis for inter-institutional transfers considered in *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976): 'what would best serve institutional security or the safety and welfare of the inmate.' The Supreme Court having found that no liberty interest is implicated in arriving at the decision to transfer the offender in *Meachum,* the same conclusion must be reached here. As in *Meachum,* there is in the Administrative Segregation policy no 'shall ... unless' language found critical by the Supreme

Court in *Greenholtz* [v. Inmates of Nebraska Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).] 554 F.Supp. at 1070.

The present case is comparable to the factual situation presented in *Love* in that the plaintiff herein was placed in a segregated cell for administrative reasons. Certainly the segregation of an inmate from the general population upon his arrival at the Prison for purposes of orientation and/or observation and evaluation serves valid penological purposes. The plaintiff, choosing to rely on his belief that he was placed in disciplinary segregation as part of some unexplained grand conspiracy existing against him, presented no evidence which would indicate that the State of Indiana or the Prison had created any justifiable expectation on his part that he would not be segregated from the general population absent specified events. This failure, coupled with plaintiff's failure to prove that his conditions of confinement in D-Seclusion were noticeably different than they would have been had he been placed in the A & O unit, requires a finding that he has suffered no Due Process Clause deprivation in this case. *See also, generally, Olim v. Wakinekona,* — U.S. —, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Kincaid v. Duckworth,* 689 F.2d 702 (7th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 2126, 77 L.Ed.2d 1305 (1983).

### IV.

Therefore, it is now the ORDER of this court that judgment be entered in favor of the defendant, Jack R. Duckworth, and against the plaintiff, Eugene Keith Sulie.