Tommie SMITH; Gregory Resnover; Richard Moore; Michael Daniels; Larry Williams: Gary Burris; Richard Dillion; Thomas Schiro; Rufus Averhart; William Minnick; Jay Thompson; Douglas Wallace; and Frank Davis, Plaintiffs,

v.

John SHETTLE; Cloid Shuler; Dr. Norman Hunt; Jack Duckworth; and Edward Cohn, Defendants.

Jim LOWERY, Plaintiff,

v.

Jack DUCKWORTH; Edward L. Cohn; Robert Bronnenberg; and John Shettle, Defendants.

Civ. Nos. S 82–526, S 83–132.

United States District Court,
N.D. Indiana,
South Bend Division.

July 27, 1988.

Tom Broden, Univ. of Notre Dame School, Notre Dame, Ind., Ivan Bodensteiner, Valparaiso Univ. School of Law, Valparaiso, Ind., John H. MacDonald, Buchanan, Mich., for plaintiffs.

David A. Arthur, Office of Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Plaintiffs, all Death Row inmates incarcerated at the Indiana State Prison (I.S.P.), have filed a complaint pursuant to 42 U.S. C. § 1983, and invoking this court's jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4). Plaintiffs are represented by court appointed counselors, Professor Tom Broden from the University of Notre Dame School of Law, Dean Ivan Bodensteiner from the Valparaiso Unviersity School of Law, and John H. MacDonald, a private attorney from Buchanan, Michigan. The defendants are represented by David A. Arthur, Deputy Attorney General for the State of Indiana.

This matter is presently before the court on a motion for partial summary judgment. Plaintiffs are challenging the defendants' practice of placing inmates sentenced to death (I.S.T.D.) on "Death Row" without sending them through the classifying process available to others committed to the Indiana Department of Correction (D.O.C.). Plaintiffs are requesting an order directing the defendants to establish a reasonable regimen in which each present I.S.T.D. is individually classified. Plaintiffs contend that the Indiana statutes create a liberty

interest for those sentenced to death to be classified in the same manner as those not sentenced to death i.e., a resulting chance for an I.S.T.D. to be housed in the general population. In addition, plaintiffs contend that any practice the D.O.C. follows in housing those sentenced to death separately from those not sentenced to death is inconsistent with the statutory provisions relating to involuntary segregation.

It is the defendants' contention that inmates in the D.O.C. do not have a substantive right to be in the general population or to be in one assignment instead of another. Further, in defendant Duckworth's Answers to Plaintiffs' Third Set of Interrogatories, Duckworth stated why all I.S.T.D. are assigned to involuntary segregation on Death Row:

> An offender under a sentence of death is segregated because he is considered a high security risk. Due to his unique sentence, he could pose a threat to the safety of members of the general population, or could be threatened himself by members of the general population.

Interrogatory No. 28. The defendants feel that the I.S.P. need not wait until a problem manifests itself in order to take action to prevent recurrences. The plaintiffs' Eighth Amendment claims as to Death Row conditions will not be considered in this Memorandum and Order.

## I.

## HISTORY OF DEATH ROW IN INDIANA

A section of the Indiana State Prison has been designated as Death Row during this century. At one time a statute existed which mandated that those men sentenced to death be kept on death row. See Burns 35–1–46–12, 1965 Replacement, which provided:

> Upon the receipt of such condemned person by the warden of the state prison, he shall be confined therein until the time for his execution arrives, and, while so confined, all persons outside of said prison shall be denied access to him, except his physician and lawyers, who shall be admitted to see him when necessary to his health or the transaction of business, and the relatives, friends and spiritual advisors of the condemned, who shall be admitted to see and converse with him at all proper times, under such reasonable regulations as may be made by the directors and warden of the prison.

Acts 1905, c. 169, S. 313.

However, that statute was repealed in 1983. See P.L. 311–1983, Sec. 49. Since repeal of that statute, there has been a standing practice of incarcerating I.S.T.D. on Death Row. This court has not been furnished with evidence to indicate that inmates sentenced to death have been incarcerated in parts of the I.S.P. other than Death Row.[1]

Plaintiffs cite that the historical circumstances of the concept of Death Row have changed since its inception. Plaintiffs have proffered evidence that men were on Death Row for only a few weeks to at most a few months in the 1920's. Plaintiffs' Brief in Support of Motion for Partial Summary Judgment filed on December 1, 1987, p. 13. Due to the post-conviction review process and the increased number of death sentences, by 1985 the average Death Row inmate was spending six to ten years on Death Row. *Id.* In light of these circumstances, plaintiffs now encourage this court to consider a less restrictive regimen for Death Row inmates.

## II.

## LIBERTY INTEREST

The basic question here is whether plaintiffs have a liberty interest in being housed with the general population of the prison.

---

1. Not all men sentenced to death are currently incarcerated on Death Row at the I.S.P. One is incarcerated at a prison in Illinois on other charges; one is ill at the Indiana State Reformatory; one is in a disciplinary cell; and one is away by court order. See defendant Duckworth's Answers to Plaintiffs' Third Set of Interrogatories, Interrogatory No. Two. The remainder of the men sentenced to death are incarcerated on Death Row. The three women who are sentenced to death in Indiana are incarcerated at the Indiana Women's Prison. This case only involves those I.S.T.D. who actually reside on Death Row.

If a liberty interest is found to exist, this court must determine whether plaintiffs were denied procedural due process in not being given the opportunity to be classified with the resulting possibility of residing in the general population. If a liberty interest is found not to exist, it must be determined that plaintiffs were not denied procedural due process.

■ Liberty interests that are protected by the Fourteenth Amendment may arise from two sources: The Due Process Clause of the Fourteenth Amendment and state law. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). See also *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). As previously stated, the state statutes which placed those I.S.T.D. on Death Row was repealed. Since no mention is made in the Indiana statutes of segregating Death Row prisoners, plaintiffs believe that they now have a liberty interest in being part of the general population. Plaintiffs contend that housing I.S.T.D. separate from the general population is akin to involuntary segregation. Plaintiffs essentially assert that the procedures in Indiana Code 11–10–1–7 dealing with involuntary segregation must be followed when isolating those I.S.T.D. Indiana Code 11–10–1–7 reads:

**Involuntary segregation of offender; review; disciplinary segregation**

Sec. 7. (a) An offender may be involuntarily segregated from the general population of a facility or program if the defendant first finds that segregation is necessary for the offender's own physical safety or the physical safety of others.

(b) The department shall review an offender so segregated at least once every thirty (30) days to determine whether the reason for segregation still exists.

(c) This section does not apply to disciplinary segregation under IC 11–11–5. Plaintiffs believe that the above statute has special significance, since it was enacted after the statute that authorized isolation on Death Row was repealed. Thus, plaintiffs contend that I.S.T.D. should not be segregated in Death Row without being

given the species of Due Process found in I.C. 11–10–1–7. Due Process rights may only follow where a liberty interest exists. Essentially, the plaintiff would prefer a plan implemented whereby incoming I.S.T.D. are classified like other offenders and whereby existing I.S.T.D. should be reclassified and provided proper Due Process rights before being placed in Death Row.

### A.

The Supreme Court of the United States has stated that prison officials should have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. *Hewitt v. Helms*, 459 U.S. at 467, 103 S.Ct. at 869. The Court has further concluded that "to hold ... that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum v. Fano*, 427 U.S. at 225, 96 S.Ct. at 2538. Further, the decisions of the Supreme Court have consistently refused to recognize more than the most basic liberty interests in prisoners. *Hewitt*, 459 U.S. at 467, 103 S.Ct. at 869. (See *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), where the Court stated that "[l]awful incarceration brings about the necessary withdrawal or limitations of many privileges and rights, a retraction justified by the considerations underlying our penal system.").

■ The court must accord great deference to defendant Duckworth's conclusion that I.S.T.D. are "a high security risk" and should be housed separately from the general population. See Plaintiffs' Third Set of Interrogatories to Defendant Duckworth, Interrogatory No. 28, *supra*. "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in

itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). While this court will not rule now as to the conditions on Death Row, it does find that the fact of confining I.S.T.D. separate from the general population is not violative of the Eighth Amendment. In reaching this conclusion, this court finds solace in the Seventh Circuit's decision in *Lewis v. Lane,* 816 F.2d 1165 (7th Cir.1987). There, the Seventh Circuit stated:

> We, of course, recognize that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). This deference, however, "does not insulate from review actions taken in bad faith and for no legitimate purpose." *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). Thus, if the prison administrators used an otherwise legitimate security measure in a manner designed to harass prisoners, the eighth amendment might be implicated.

816 F.2d at 1171. Defendants have not committed a *per se* violation of the Eighth Amendment by separating those I.S.T.D. from those inmates not sentenced to death. See also *Mathews v. Fairman,* 779 F.2d 409 (7th Cir.1985), and *Sulie v. Duckworth,* 583 F.Supp. 995 (N.D.Ind.1984), *aff'd,* 767 F.2d 924 (7th Cir.1985). "There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977). In a district court case from the state of Washington, the court there found that defendants acted reasonably in restricting contact between Death Row inmates and other prisoners as a means of providing heightened security. *Jeffries v. Reed,* 631 F.Supp. 1212, 1218 (E.D.Wash.1986). The court in *Jeffries* further found that Death Row inmates are not a group which gives rise to a suspect classification. *Id.* at 1217.

**B.**

In *Hewitt, supra,* Helms was placed in administrative segregation as a result of his participation in a prison riot. The Court determined that administrative segregation is the sort of confinement that an inmate should reasonably anticipate receiving at some point during incarceration, but that it did not involve an interest independently protected by the Due Process Clause of the Fourteenth Amendment. However, in light of the Pennsylvania statutes and regulations setting forth the procedure for segregating an inmate in administrative segregation, the Court found that Helms did acquire a protected liberty interest in remaining in the general prison population. *Id.* 459 U.S. at 470–471, 103 S.Ct. at 871. The Court concluded that the process afforded to Helms satisfied the minimum requirements of the Due Process Clause of the Fourteenth Amendment.

In reaching their decision, the Court considered the following Pennsylvania statutes:

> Title 37 Pa.Code § 95.104(b)(1) (1978) provides:
>
> "An inmate who has allegedly committed a Class I Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title."
>
> Section 95.104(b)(3) of the same Title provides:
>
> "An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible

that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reasons for the security concern has abated but in all cases within ten days."

The plaintiffs argue that the above Pennsylvania statutes are akin to I.C. 11–10–1–7, *supra*, and that they should be rendered the due process as set forth in said statute. However, those inmates who are involuntarily segregated pursuant to I.C. 11–10–1–7 are inmates who are, at the time they are segregated, inmates housed in the general population. In *Hewitt*, Helms was also housed in general population at the time he was involuntarily segregated. In Indiana, I.S.T.D. have never been housed in the general population. Thus, it may be concluded that since I.S.T.D. are not housed in the general population, I.C. 11–10–1–7 is a statute that is not applicable to those I.S.T.D.[2]

### C.

The statutory scheme regarding the death penalty procedure in Indiana does not anticipate that those sentenced to death are to be classified and housed in the same manner as those not sentenced to death. Indiana Code 35–38–6–2 details the manner in which the sentencing court issues the death warrant to the sheriff:

**35–38–6–2 Court to issue warrant to sheriff; contents**

Sec. 2. The court in which a death sentence is ordered shall issue a warrant to the sheriff within fourteen (14) days of the sentence:

(1) that is under the seal of the court;

(2) that contains notice of the conviction and the sentence;

(3) directed to the warden of the state prison; and

(4) that orders the warden to execute the convicted person at a specified time and date in the state prison.

Indiana Code 35–38–6–3 details the manner in which the I.S.T.D. is delivered to the Indiana State Prison:

**35–38–6–3 Delivery of person to warden; receipt of delivery of person**

Sec. 3. A sheriff who receives a warrant under section 2 or section 7 of this chapter shall immediately:

(1) transport the person to the state prison;

(2) deliver the person and the warrant to the warden of the prison;

(3) obtain a receipt for the delivery of the person; and

(4) deliver the receipt to the clerk of the sentencing court.

The procedures for the intake of all other offenders who are sentenced can be found in I.C. 35–38–3–1 *et seq.* Thus, it can be reasonably inferred from the Indiana statutory scheme that I.S.T.D. are to be classified differently from those not sentenced to death.

In *Hewitt, supra,* the Supreme Court further found that a state must use explicit language in a statute before a liberty interest will be recognized. The Court concluded as to whether the Pennsylvania statutes explicitly created a liberty interest:

It [the Commonwealth of Pennsylvania] has used language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, see n. 6 *supra*, and that administrative segregation will not occur absent specified substantive predicates—viz., "the need for control," or "the threat of a serious disturbance." Petitioners argue, with considerable force, that these terms must be read in light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded

---

**2.** The segregated status which I.S.T.D. enjoy must not be confused with disciplinary segregation neither. See Indiana Code 11–11–5–1 *et.*

*seq.* Inmates sentenced to death are subject to disciplinary action the same as those inmates not sentenced to death.

that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest. *Hewitt,* 459 U.S. at 471–472, 103 S.Ct. at 871. See related Pennsylvania statutes, Title 37 Pa.Code 95.104(b)(1) and (3) (1978). The Court of Appeals for the Seventh Circuit has also found that a state must use "mandatory" language in a statute before a liberty interest may be found. See *Culbert v. Young,* 834 F.2d 624, 628 (7th Cir. 1987). See also *Miller v. Henman,* 804 F.2d 421, 424 (7th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987) (When a regulation or rule with binding force establishes substantive criteria, it also creates constitutional "liberty" or "property" ... and because the liberty and property of a prisoner are defined by the substantive rules of positive law, the absence of such rules is dispositive.); *Huggins v. Isenbarger,* 798 F.2d 203, 205 (7th Cir.1986) (If rules of law require the parole officials to act in specified ways, then there is a protected interest, a "legitimate claim of entitlement."); *Campbell v. Miller,* 787 F.2d 217, 223 (7th Cir.1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986) (Unless the regulation limits an official's discretion in denying the benefit to "objective and defined" criteria, no protected interest has been created.). This court is unaware of any Indiana statute or regulation which either explicitly or indirectly gives rise to an I.S.T.D. in having a liberty interest to be classified the same as those inmates not sentenced to death. More specifically, there is not an Indiana statute or regulation which even remotely suggests that I.S.T.D. have a liberty interest to be housed in the general population.

### D.

The Court of Appeals for the Seventh Circuit has had the opportunity to review the prisoner classification procedures of Indiana. In *Kincaid v. Duckworth,* 689 F.2d 702 (7th Cir.1982), *cert. denied,* 461 U.S. 946, 103 S.Ct. 2126, 77 L.Ed.2d 1305 (1983), the question was whether Kincaid had a liberty interest in the minimum custody status within the meaning of the Due Process clause. The Seventh Circuit stated:

Not every state action carring adverse consequences for prison inmates automatically activates a due process right. *Moody v. Daggett,* 429 U.S. 78–86–88, 97 S.Ct. 274, 278–279, 50 L.Ed.2d 236 (1976); *Meachum v. Fano,* 427 U.S. at 224, 96 S.Ct. at 2538.

Under Indiana law, state prisoners have no right to be assigned any particular security classification. The state has placed the decision to change the security classification of prisoners who have served two years solely within the discretion of the Department. Thus, any expectation an inmate may have in being considered for a lower security clearance is too insubstantial to rise to the level of due process protection. *Meachum v. Fano,* 427 U.S. at 228, 96 S.Ct. at 2540; *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Hluchan v. Fauver,* 480 F.Supp. 103, 108 (D.N.J.1979).

\* \* \* \* \* \*

The District Court did not err in concluding that "[t]here is no expectation [of a liberty interest] rooted in [Indiana] law or regulations which create an obligation to reclassify" Kincaid on the basis of the due process clause.

689 F.2d at 704, 705. In *Martin v. Duckworth,* 581 F.Supp. 1282, 1284 (N.D.Ind. 1984), this court, following *Kincaid,* found that inmates in Indiana correctional facilities have no state-created or recognized constitutionally protected right to be assigned to any particular security classification. See also *Sulie v. Duckworth,* 583 F.Supp. 995, 1002 (N.D.Ind.1984). Thus, it is apparent that I.S.T.D. do not have a liberty interest in being classified at a certain level under the Indiana statutes.

### E.

In other circuits, it has been specifically held that Death Row inmates do not have constitutional or state law liberty interest in remaining with the general population of the prison. In *Smith v. Coughlin,* 748 F.2d 783 (2nd Cir.1984), Smith argued that

his incarceration in a special Unit of Condemned Persons [a death row] without a prior hearing deprived him of a liberty interest without due process of law. In denying Smith's contention, the Second Circuit found that New York Correct. Law § 650, which expressly mandated his confinement, did not create a liberty interest in remaining in the general population. Smith, who was previously incarcerated in general population, was transferred to the Unit of Condemned Persons after he murdered a prison guard and was sentenced to death. Certain liberty interests which Smith had while incarcerated in the general population were extinguished when he was removed to the Unit of Condemned Persons after his murder conviction and resulting death sentence. See N.Y. Correct. Law § 137(6); and 7 N.Y.C.R.R. § 250. One of these liberty interests extinguished was the right to remain in the general population.

In Indiana, I.S.T.D. have never been housed in the general population, nor have they been led to believe that they have a right to be housed in the general population. In *Parker v. Cook*, 642 F.2d 865, 873 n. 3 (5th Cir.1981), the Fifth Circuit observed that it was "not inherently unconstitutional to differentiate among classes of prisoners, providing some classes with more desirable living conditions." Later in the opinion, the Fifth Circuit discusses placing death row inmates in administrative segregation and not in the general population.

It appears that, when a person in Florida is convicted of a capital crime and sentenced to death, that person is transferred to a prison and immediately placed in administrative segregation. Because death row inmates are never placed in the general population or given an expectation of being placed in the general population, it appears that no liberty interest is affected when they are placed in administrative segregation. Assuming that the State's classification of these inmates is sufficiently rational to withstand an equal protection challenge (a question about which we express no opinon) and that all other constitutional guarantees are met, *cf.*, *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (segregation of prisoners on the basis of race violates the Equal Protection Clause), the states are free to choose this alternative; in the absence of a liberty interest, due process is inapplicable. 642 F.2d at 874 n. 7. This court's reasoning in regard to confining I.S.T.D. on Death Row is similar to the reasoning of the Fifth Circuit in *Parker*; i.e., that since I.S.T.D. have never been a part of the general population and do not have a liberty interest to be in the general population, plaintiffs do not have any due process rights in regard to the same. See also *Jeffries v. Reed*, *supra* (Death Row inmates are not a suspect class and restrictions on contact between death row inmates and other prisoners is reasonable means of providing heightened security.).

### F.

This court finds that a liberty interest does not exist for I.S.T.D. to be classified in the same manner as inmates not sentenced to death with the resulting possibility of those I.S.T.D. being housed in the general population. Inmates sentenced to death do not have a state-created right or constitutionally protected right to be assigned to a particular security classification. This court reserves ruling as to plaintiffs' specific Eighth Amendment claims in regard to conditions on Death Row. IT IS SO ORDERED.