A. Correct.
(ECF No. 1758 at 50 ).
Dr. Hinton was also asked about the dangers the lack of appropriate staffing can have on an individual who is taking psychotropic medicine. His testimony went as follows:
Q. And you've heard all the ills that can come if somebody is on psychotropic medicine and it's not being monitored, right?
A. Correct.
Q. And you know that's dangerous, don't you?
A. Correct.
Q. And you know that the 6,000 people are being endangered every day they're not seen correctly; isn't that right?
A. Certainly is a concern, yes.
Q. It's more than a concern. It's your responsibility that they get that care; isn't that right?
A. Correct.
Q. And you know they're not getting it?
A. Correct.
(ECF No. 1758 at 52-53 ).
Dr. Hinton's testimony at the preliminary injunction hearing regarding inmates who are in segregation was extremely troublesome. Dr. Hinton explained:
Q. [ ]. Why do you have so many mentally ill people in segregation and so few regular population people in segregation?
A. I think, in general, the percentage of folks who are mentally ill tend to have more behavioral issues, in part because of their mental illness.
Q. So, you've got so many of them in segregation because they do -- they don't follow the rules well, right?
A. In part.
Q. And has anyone, to your knowledge, wondered whether or not putting mentally ill people in segregation is good for them?
*900 A. Yes.
Q. Who's done that?
A. I have.
Q. And what's your view?
A. My view is there's nothing -- there's nothing that is a good thing about being in segregation. We need to make sure that they have proper access to treatment.
Q. Now, I believe your testimony the last time I took it on that subject was it won't hurt them if we treat them with the treatment they need, right?
A. Access to treatment, correct.
Q. But how do you know they're getting the treatment they need if they're in segregation?
A. That's why we have to make sure that there are no barriers to the access to treatment.
Q. But you don't have enough people?
A. Correct.
Q. So, you know they're not getting the right treatment?
A. We know that there's significant staffing shortages.
Q. They're not getting the right kind of psychiatric care, right?
A. We don't have -- correct, we don't have the right staffing requirements.
Q. They're not getting enough groups because you don't have enough people to run the groups?
A. Correct.
Q. And you know from your own personal judgment that if you're not doing that for people in segregation, they're going to get worse; isn't that right?
A. Across the board.
(ECF No. 1758 at 81-82 ) (emphasis added).
Second, Dr. Michael Dempsey, M.D., staff psychiatrist for Wexford Health Sources from January 2013, until September 2015, who was physically located at Pontiac Correctional Center, also testified about the lack of psychiatric staffing at the IDOC in the following manner:
Yeah, we don't have enough psychiatrists to treat the patients. We just don't. If I remember correctly, IDOC had projected that they needed 66-1/2 full-time-equivalent psychiatrists to provide care for the population within the IDOC. I'm not sure if we've reached 25 full-time-equivalents at this point since I haven't been working there for the last six months. I know it's not 66.
(ECF No. 1757 at 197 ). Dr. Dempsey further explained the problems associated with the lack of staffing are as follows:
I believe that we didn't have enough psychiatrists with the kind of expertise that is necessary to understand the correctional system.
Corrections is a unique environment. It takes into account the fact that a person with a serious mental illness who is not in a natural environment is somehow expected, without the kind of supports they need, to function adequately, to understand the rules, the regulations.
And when you have patients who are seriously mentally ill, who may be psychotic, who have impaired reality testing, and you put them in an environment where they're segregated, where they're not treated to any appropriate degree or subtherapeutically, and their options are limited, and they have to make important decisions, I find it becomes an emergent situation.
(ECF No. 1757 at 199 ).
Finally, when discussing the psychiatric and mental health backlog (more fully discussed below), Dr. Stewart explained during the preliminary injunction hearing:
Well, you know -- again, that backlog can't be taken in isolation. You gotta look at the overall system. So, here *901 we're talking about, you know, increased use of crisis cells, increased use of restraints, increased use of force, people suffering because of untreated mental illness. All of that has to -- is linked in some way with the fact that patients aren't being seen frequently enough or seen at all.
(ECF No. 1757 at 260 )(Emphasis added). In his Mid-Year Report, Dr. Stewart further explained:
IDOC leadership has been well aware of the problems related to the insufficient amount of psychiatric services and yet has been unable to adequately solve this issue. At the time of the submission of this midyear report, however, the lack and quality of psychiatric services continues to negatively impact all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement. Of note, these deficiencies regarding psychiatric services were reported in the First Annual Report. The Monitor personally met with Director Baldwin on 6/26/17 to discuss this problem. To date, IDOC is yet to effectively address this emergency.
(ECF No. 1646 at 9 ).
The record leaves no question there was constitutionally deficient care being provided by the Defendants at the time of the preliminary injunction hearing. The Court also finds for reasons stated herein, that despite the good efforts of the Defendants, constitutionally deficient care is still being provided. The Court's finding is based generally on the fact that there is insufficient mental health staffing at the IDOC. Moreover, to the extent there have been improvements in the delivery of mental health services, the record is clear those measures are unsustainable.
As noted above, Dr. Hinton testified at the preliminary injunction hearing as follows:
Q. You know today you can't deliver the care-the psychiatric care that is required for the 12,000 patients because you don't have enough psychiatrists?
A. Correct.
(ECF No. 1758 at 50 ). Dr. Hinton testified at the permanent injunction hearing that the IDOC is now providing adequate care to mentally ill inmates. (ECF No. 2372 at 31 ). The Court does not doubt the sincerity of Dr. Hinton's current assessment. However, his current position is in stark contrast with the evidence presented at the preliminary injunction hearing only three months earlier, and therefore is viewed with considerable caution. (See ECF No. 2070, ad passim ; see also ECF No. 2070 at 16-18, Order capturing portions of Dr. Hinton's testimony; supra , pp. 897-900). Importantly, it appears Dr. Hinton's assessment is based largely on the fact that the IDOC has the "proper procedures in place to provide adequate treatment," and not based on the actual care being given to inmates. (ECF No. 2375 at 5, Dr. Hinton, testifying in a deposition dated August 17, 2018, avoided addressing whether inmates were being given adequate care, instead testifying "[i]t is my testimony that we have the proper procedures in place to provide adequate treatment to all of our population.")(Emphasis added). Additionally, it should be noted that Defendants maintain they now have the leadership, staffing, and procedures in place to provide the necessary constitutional care. (ECF No. 2405 at 16 ). Dr. Hinton also explained that he did not have anything to do with the certification from the IDOC that they were in compliance with the Court's May 25, 2018, Order. (ECF No. 2372 at 18 ). Dr. Hinton specifically explained he was not at every prison for the *902 "day-to-day activit[ies]." Id. It is clear the IDOC is concerned with the staffing levels of mental health providers. Baldwin testified that the IDOC continues to ask Wexford for additional mental health staff. (See also ECF No. 2370 at 95, Baldwin acknowledges that he understood that the staff Wexford is supposed to provide is the amount necessary to provide the required service). Both Baldwin and Dr. Hinton testified about expanding the relationship with Southern Illinois University and the University of Illinois to provide additional mentally health hours but at present this is de minimis . Baldwin testified about the IDOC continuing to engage in recruitment fairs.
Like Dr. Hinton, Baldwin also maintains the opinion that the IDOC has enough staff on board to provide adequate medical treatment to the mental ill inmates. (ECF NO. 2453 at 70 ). However, Baldwin also lacks an adequate basis for his position as it is based on the fact that the IDOC has made progress in its hiring, yet he acknowledges that he does not know to what level the hiring has been made. Id. Additionally, Baldwin testified that he "believe[s] [ ] right now [the IDOC] ha[s] an adequate number of psychiatrist[s], and as we get our whole structure in place, [they will] need to increase staff [ ]." Id. The fact that the IDOC does not have all the necessary structures in place further demonstrates the problems with the current care for mentally ill inmates. Moreover, the current status of the structures suggests more staff is necessary to compensate for the current deficiencies. (See also ECF No. 2354 at 50, Baldwin acknowledging that buildings by themselves do not treat the inmates).
Moreover, it is generally undisputed that adequate staffing is necessary to deliver adequate care. In his Second Annual Report of Monitor, Dr. Stewart made it clear that non-compliance with the Settlement Agreement is a direct result of inadequate staffing. (ECF No. 2122 at 9 ). Even given his change in position, Dr. Hinton acknowledged that it takes the right number of people to provide the required care. (ECF No. 2372 at 31 ). When pressed regarding the situation at Dixon, Dr. Hinton's position was most telling:
Q. So, psychiatrists, 1255, psychologist, 692, QMHPs, 1272, BHTs, 607. That comes to roughly 3700 [hours].
You got more people vacant - oh, no. You managed to cut the vacancies from 3700 to 3000 hours. Is that adequate?
A. It's an improvement.
Q. Is it adequate?
A. Well, I think - I can't answer that yes or no, so -
(ECF No. 2372 at 49 ).
In July 2018, Defendants submitted their staffing plan. (Pl. Ex. 48A; Df. Ex. 55B). Notably, Defendants' staffing plan provides for the equivalent of 65.75 psychiatrists. (Pl. Ex. 48A; Df. Ex. 55B). The actual number of on-staff psychiatrists sits somewhere between 50-55. See supra , pp. 897-98. It should also be noted that the staffing shortage is not limited to psychiatrists. Defendants' staffing of Mental Health Directors, Psychologists, Behavioral Health Technicians, and other Mental Health Employees is also deficient. (Pl. Ex. 48A; see also Df. Ex. 6 and Df. Ex. 38; after the Settlement Agreement was signed in May 2016, the IDOC increased its mental health staffing from 80 FTEs to 453.6 FTEs. In January 2018, the overall headcount was 364.).
Again, the testimony at the preliminary injunction hearing clearly established that the mentally ill inmates were receiving inadequate care. As noted above, Dr. Hinton, Dr. Dempsey, and Dr. Stewart each testified about the deficiencies in mental *903 health staff and the impact on the inmates. Dr. Hinton acknowledged at the preliminary injunction hearing that given the deficiencies in staffing, inmates in segregation were getting worse "across the board." Dr. Stewart called the situation an "emergency." Even with the additional mental health staff hired after the preliminary injunction hearing, the numbers associated with mental health providers are deficient to provide the constitutionally required care. In fact, the June 2018 monthly facility performance report showed Wexford had failed to supply more than 10,000 hours of required clinical staff for that month. (Pl. Ex. 51; ECF No. 2376 at 290, Renzi's testimony).
The Court has given little weight to the testimony of Holly Andrilla, Defendants' expert, who opined that, statistically, given the public in general, the IDOC has more than enough psychiatrists to treat its mentally ill population. (ECF No. 2375 at 59, Andrilla concluded, among other things, "[e]very facility except Vienna, the ratio of psychiatrists per seriously mentally ill people exceeds the ratio of the general population [ ]."). Andrilla is a research scientist with the WWAMI Rural Health Research Center and the Center for Health Workforce Studies in the Department of Family Medicine at the University of Washington School of Medicine. (Df. Ex. 62). The Court takes no issue with the expert's credentials or even her general methodology. However, the Court finds the expert's analysis is inapplicable because her analysis compares the non-prison population with the prison population. (See ECF No. 2375 at 82-83, Andrilla explained the source of her data). The doctors and medical providers in this case, on both sides, have meticulously detailed the difficulties in treating the prison population with the current staff. The use of overtime is pervasive, and to put it in terms of the witnesses, "unsustainable." (See infra , pp. 903-04). It is impossible to believe there is adequate staff, even with overtime and other efforts, given the significant number of inmates who are not being timely treated based on the Defendants' own backlog assessment. Andrilla's assessment is simply contrary to the testimony and established facts in this case.
To fully appreciate the impact of the staffing deficiencies, one need not look much further than the IDOC's backlog. The term "backlog report" was used throughout the preliminary and permanent injunction hearings. The backlog report contains data supplied by the correctional center. Mercer, Illinois Regional Mental Health Quality Assurance Coordinator for Wexford Health Sources, explained her role as quality assurance coordinator is to monitor, report, and translate data related to the IDOC's compliance with the Settlement Agreement. (ECF No. 2373 at 6 ). Mercer noted that, in the past, each facility would use a different mechanism to capture the mental health treatment data. (ECF No. 2373 at 14 ). Mercer implemented the use of a database template at every facility so that each facility's database would look the same and the facilities would collect the same data. (ECF No. 2373 at 15 ). Additionally, she focused on getting the facilities to collect and record the appropriate data in the database. (ECF No. 2372 at 6 ). Mercer explained that some of the data is automatically updated based on data that is manually inputted. (ECF No. 2373 at 10, "[W]hen certain information is entered into the database, for example, the date that an individual is identified as needing mental health services, the date that a person was last seen, what -- the number of days that the provider has indicated that they want to see that person again, the database automatically generates due dates and follow-ups due dates and, et cetera ."). Mercer noted, however, that the failure to manually *904 input certain information can cause inflated numbers in the database. (ECF No. 2373 at 8 ). Ultimately, the backlog report (psychiatry) represents the backlog in "New/Face to Face," "Follow Up/Face to Face," "New Telepsych," and "Follow up/Telepsych." (See Df. Ex. 1F). The backlog is measured in increments of "1-14 day backlogged," "15-30 day backlogged," "31-45 day backlogged," "46-60 day backlogged," and "Greater than 60 day backlogged." Id.
The numbers on the August 17, 2018, backlog report show an improvement from the numbers presented during the preliminary injunction hearing. (Df. Ex. 1F). Defendants provide that the psychiatric backlog has been reduced to a total of 908. (Df. Ex. 1D and 35B). Defendants further provide that the backlog for new psychiatric appointments has been reduced to nearly zero. (Df. Ex. 1F). Nonetheless, while the backlog number may have been reduced, it is still significant in terms of the timing of the reductions, the current level of backlog, quality, and the methods undertaken to reduce the backlog. The evidence presented at the preliminary injunction hearing showed, as of October 2017, there were a total of 4,010 backlogged contacts. (ECF No. 1757 at 213 ). And as the Court noted in its previous Order, a significant reduction in the backlog only came about at the same time or after the filing of the Plaintiffs' initial Motion. (See id. , see also ECF No. 1559, filed on 10/10/2017). Additionally, Baldwin acknowledged that the backlog had been reduced, at least in part, by overtime, a method he and others acknowledge is not a long-term solution. (ECF No. 2370 at 129, "Not a log-term permanent [solution]. I see it as a short-term [solution].").
Confirming the inability to continue the current efforts and the inadequacies of staffing, Renzi, Psychologist Administrator at Pontiac Correctional Center, testified as follows:
Q. I notice in the charts and in your testimony that in terms of trying to deal with the backlogs and provide adequate care, you're trying to have people come from other institutions and work there and also offer additional overtime, correct?
A. Yes.
Q. That doesn't sound like a very good plan. I mean, is that sustainable in the long term?
A. In the long term, it would be difficult to sustain that.
Q. Yes.
A. However, the mentality - the idea that providing them some service is better than providing them no service.
Q. Yes. So - but would it be fair to say that you acknowledge that you do need more staff at Pontiac.
A. I would acknowledge that, yes.
(ECF No. 2376 at 356 ). Stromberger, Psychologist Administrator at Hill Correctional Center, also affirmed this with her testimony as follows:
Q. Well, how does it all get done if you only have half the staff you're supposed to have?
A. We work very hard.
Q. You work overtime, right?
A. At times.
Q. And is there burnout because of the excess amount of work?
A. Yeah.
Q. And do you lose good people because they're working too hard?
A. Yeah.
Q. And isn't that a problem?
A. I would say.
--
Q. Well, do you have an understanding of whether there were deficiencies - continued *905 deficiencies in staffing of mental health people?
A. Continued deficiencies in terms of staffing. Yes, there's been deficiencies for quite some time for staffing.
(ECF No. 2376 at 1433-34 ). In the Court's view there is presently no "Plan B."
At Dixon Correctional center, part of the plan to reduce the backlog was to have psychologists work on the weekends, non-traditional hours, and second shift. (ECF No. 2372 at 43 ). The Court agrees with Baldwin that the use of overtime is not sustainable. As Dr. Stewart testified, the overtime was putting a strain on employees. (ECF No. 2374 at 264, "Centralia has a minimal backlog, but the staff out there is at wit's end. They don't have enough people."). Dr. Stromberger testified that working excessive overtime causes problems with retention because of burnout. (ECF No. 2376 at 68 ). The Court has also considered the fact that in many cases the task associated with the backlog had been outstanding in the "1-14 day backlogged" benchmark. (Df. Ex. 1F). Nonetheless, even with the overtime, the backlog is still significant in certain facilities, including Pontiac, Dixon, and Menard. (Df. Ex. 1F). It should be noted that the deficiencies in staffing are not only related to psychiatrists. The deficiencies lie in all areas of mental health staff. (Pl. Ex. 48A; Df. Ex. 55B). This is a real problem, and one that must be addressed now.
Both Parties utilize the processes implemented by Dr. Sim in support of their positions. Defendants note that his work has resulted in a useful tool to allow the Defendants to focus on problem areas. Plaintiffs assert the reports show serious deficiencies in the actual delivery of services - and further demonstrate the difficulty with staffing. This Court finds both are correct.
Dr. Sim has been tasked with developing and implementing a mental health quality assurance process. Dr. Sim's process includes an audit tool and a mechanism to allow the correctional centers to make corrective action. Dr. Sim described two different audit processes: (1) internal audits, conducted by the psychologist administrator or a social worker at the facility; and (2) external audits, conducted quarterly by regional administrators. Dr. Sim explained that his audit identifies 315 "problem statements." Problem statements are "verbiage" that came from the settlement agreement, standard operating procedures, or the administrative directives. (ECF No. 2375 at 125 ). These problem statements are then placed into four broad categories. (ECF No. 2375 at 126-128 ). The review uses these statements when conducting their audit as follows:
[ ] when the mental health authorities, the psych administrator or social worker for when they conduct their audit, when they open up the documentation, the medical charts, if they see that certain things are not being [done] - that is on this list, that means it's considered non-compliant.
(ECF No. 2375 at 126 ).
The internal audit in turn uses these compliance categories and the problem statements to assess the Department's compliance in the following ten areas: (1) Intake; (2) Crisis Writ and Transfer; (3) Mental Health Follow-Up; (4) Mental Health Treatment Plan; (5) Crisis Management, Intervention and Documentation; (6) Psychiatric Services; (7) Mental Health Disciplinary Review/Restricted Housing; (8) Use of Restraints; (9) Mental Health Evaluations; and (10) Supervision for Non-Clinical Licensed Mental Health Staff. (ECF No. 2375 at 130 ; Df. Ex. 3D). The audits used to be conducted every month. (ECF No. 2375 at 132 ). Starting in July *906 2018, the audits were conducted every other month. Id. Dr. Sim explained this change was to allow mental health staff more time to provide services to inmates. In addition, Sim explained this would allow the auditors the ability to review the data and develop effective corrective action plans. (ECF No. 2375 at 133 ). The correctional centers can use the results as a tool to take corrective action. Undoubtedly, this is a good thing.
However, in July 2018, several of the institutions were performing below the 85% threshold set by the IDOC. (ECF No. 2375 at 180 ). In some cases, significantly lower. That, in and of itself, does not raise undue concern. But, an examination of the results further reveals the difficulty the IDOC is having with staffing. The following discussion highlights this Court's concerns:
Q. For the corrective action plans for Pontiac marked July 18th, these would be the corrective action plans to follow the audit that we just looked at, correct?
A. Yes.
Q. Okay. And we see the 20 -- for the first sheet is about mental health treatment plans, and it has that compliance score of 20 percent at the top, correct?
A. Yes.
Q. Okay. And the first deficiency is, Mental health treatment plan was not filed in the medical record, correct?
A. Correct.
Q. And that's a clerical? It's listed as a clerical error on Missing Information?
A. Yes.
Q. That's the category?
A. Yes.
Q. But we don't know from this whether the treatment plan just wasn't done or it wasn't filed?
A. I don't know.
Q. Okay. But regardless, the action plan is for staff to use overtime to do treatment plans, right?
A. Yes.
Q. Okay. And the deficiency number two also relating to treatment plans is that there wasn't -- there was no monthly treatment plan updated for mental health patient in restrictive housing for more than one month. Do you see that?
A. Deficiency number two.
Q. Deficiency number two, correct?
A. Yes.
Q. So, that would have been one of the top three most common deficiencies for Pontiac in this audit?
A. Yes.
Q. And the corrective action plan here is for MHPs to use monthly one-to-one sessions for treatment planning for seg offenders. Do you see that?
A. Yes.
Q. So, that means that they're going to take time from the prisoner's individual counseling session to meet the treatment planning requirement, correct?
A. That's what it shows.
(ECF No. 2375 at 162-64 ). This colloquy between Plaintiffs' counsel and Dr. Sim demonstrates the ongoing shift by the Defendants of their limited staff resources from one area of concern to another and the need to cover essential items by use of overtime. This is simply unsustainable.
The Court further finds the Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference. Wellman v. Faulkner , 715 F.2d 269, 272 (7th Cir. 1983) (citing Todaro v. Ward , 565 F.2d 48, 52 (2d Cir. 1977) ) ("When systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its *907 injunctive powers."). There have undoubtedly been efforts on the part of the Defendants to address the staffing needs regarding mental health; however, these efforts have been generally ineffective - and have gone on far too long without any significant attempt to adapt or modify based on the knowledge gained from their recruitment efforts. While some efforts have been successful, including the recent expansion of the use of telepsychiatry, the Defendants have failed to achieve a minimum level of medical service to avoid the label of cruel and unusual punishment. Id.
Medication Management
Dr. Stewart explained that psychiatric conditions are brain illnesses. (ECF No. 1757 at 241 ). Dr. Stewart testified that psychotropic medications can have harsh side effects and require constant monitoring. (ECF No. 1757 at 242, Dr. Stewart specifically explained "[s]ome of [the medication] have some pretty harsh side effect profiles that require constant monitoring [and some that] you need to follow-up with laboratory work; you need to follow-up with [ ]blood pressure monitoring in certain cases [and] follow-up on the abnormal involuntary movement scale."). Additionally, the failure to properly monitor an inmate's medication may result in poor medication compliance, including the possibility that the inmate will cease taking medication. (ECF No. 1758 at 40, Dr. Stewart testified "where you have poor medication compliance because people are experiencing side effects, and they don't get those addressed, so the medications are just stopped."). Dr. Stewart ultimately concluded at the preliminary injunction hearing that "[i]t's rare when someone is being seen every 30 days [and he has] [f]ound examples of people being seen -- of medications being routinely written for anywhere from two to six months." (ECF No. 1757 at 243 ). The reason Dr. Stewart was given by prescribers, the nursing staff, and the clinical administrators for medication being prescribed for longer periods of time was because "[the IDOC doesn't] have enough people to see people every 30 days so [they] write the meds longer so the meds won't expire, and hopefully [they'll] see them within a couple months or three months." (ECF No. 1757 at 243-44 ). Dr. Stewart also testified that class members were exhibiting severe side-effects that were not charted in their records. (ECF No. 1757 at 251 ).
These conclusions went generally uncontested at the preliminary and permanent injunction hearings. In fact, Dr. Hinton acknowledged at the preliminary injunction hearing that understaffing is a significant problem regarding medication management, noting that thousands of inmates who receive medication in the general population are placed in a dangerous situation by not being seen by psychiatrists. (ECF No. at 319-20).
The danger was recognized by the Parties and several provisions were inserted into the Settlement Agreement to insure proper medication management.
Sections XII(b) of the Settlement Agreement provides:
Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC Administrative Directive 04.04.101, § II(F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).
(ECF No. 711-1 at 15 ). The referenced Administrative Directive provides:
Offenders who are prescribed psychotropic medication shall be evaluated by a *908 psychiatrist at least every 30 days, with extensions on follow-up care for those who psychiatrist have found and documented that the offender has reached stability (outpatient level of care: Not to exceed 90 days; RTU level of care: not to exceed 60 days).
Additionally, the Settlement Agreement requires:
The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive, dyskinesia, high blood pressure, and liver function decline [and]
Adherence to standard protocols for ascertaining side effects including client interviews, blood tests, blood pressure monitoring, and neurological evaluations [ ].
(ECF No. 711-1 at 15 ).
In addition to the staffing issues discussed above, the evidence at the permanent injunction hearing revealed the continuation of significant issues with the IDOC's medication management. First, the mental health staff at the correctional centers recognize there is an issue with follow-up because the nursing staff who administer the medications do not notify them when inmates are non-compliant. Dr. Renzi testified that a lot of the inmates will accept the medication from the nurse, and then put the medication in their mouth as to appear as though they are taking it. (ECF No. 2376 at 278 ). However, the inmates may "cheek" the medication or swallow it, and later regurgitate it. Id. Dr. Renzi acknowledged that Pontiac continues to have difficulty in assuring that offenders are actually taking their medication, but there have been educational efforts to train staff. (ECF No. 2376 at 277-79 ). Dr. Stromberger testified that nursing staff are not fully aware of referral protocol when class members refuse medications. (ECF No. 2376 at 48 ). Dr. Stromberger, however, did note that there had been some educational follow-up on that issue.
This testimony is consistent with Dr. Stewart's testimony during the preliminary injunction hearing. Dr. Stewart testified that one major problem is that inmates are given their medications but not monitored closely to ensure they have ingested the pills, especially in segregation. (ECF No. 1757 at 123 ). Dr. Stewart testified one of the inmates he visited had numerous pills on his person that he had not taken. (ECF No. 1757 at 254 ). It should be noted that Dr. Puga is certainly aware of these issues and has been working on measures to assist in medication compliance. (ECF No. 2372 at 136-37 ). Nonetheless, these issues again highlight the general staffing issues and the need for additional measures to be considered.
Mental Health Treatment in Segregation
Segregation refers to an inmate's confinement in his or her cell for a period of 22 to 23 hours a day. (ECF No. 1757 at 103 ). In the IDOC, over 80% of the inmates in the IDOC who are in segregation are mentally ill. (Pl. Ex. 22, 897 out of 1105 inmates in segregation are mentally ill). Dr. Hinton opined that the "percentage of [inmates] who are mentally ill tend to have more behavioral issues, in part because of their mental illness." (ECF No. 1758 at 81 ). Dr. Hinton further opined that "there's nothing that is a good thing about being in segregation." Id. Supporting such an opinion, Dr. Stewart testified "[a] person with a pre-existing mental illness placed in segregation will have an exacerbation of their pre-existing mental illness." (ECF No. 1757 at 109 ). Segregation can also cause a degradation of coping mechanisms and lead to increases in self-harm and other acting-out behaviors. (ECF
*909 No. 1757 at 109-111 ). Dr. Renzi also agreed that segregation can have a negative effect on mental illness. (ECF No. at 2376 at 295 ). Inmates Champs, King, Span, and Singleton all testified about their negative experience in segregation. (ECF No. 2376 at 91-112, 113-148; ECF No. 1758 at 271-287, 394-412). Given this, it is clear mental health issues must be addressed for mentally ill inmates in segregation.
Under Sections XV(a)(iii), the Parties agreed that:
Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.
(ECF No. 711-1 at 17 ). The Settlement Agreement places certain timeframes on MHP's review of, and updates to, the treatment plans for mentally ill offenders placed in segregation. Id. Dr. Stewart explained the purpose of this requirement is simple - when you place an inmate "into a segregation system, you need to review and update the treatment plan given the vastly different environment the person is in."[3] (ECF No. 1905 at 82 ).
During the preliminary injunction hearing, Dr. Stewart testified that the IDOC's medication management for those in segregation is worse than for Class Members elsewhere in the system. (ECF No. 1757 at 123 ). Dr. Stewart specifically noted that there is a significant problem in the failure to ensure that those in segregation who are prescribed psychotropic medication actually take the medication. (ECF No. 1757 at 123 ). Additionally, there was testimony and evidence during the preliminary injunction hearing regarding Defendants' non-compliance with the out-of-cell time required for mentally ill inmates placed in segregation. (ECF No. 1757 at 136 ; see also ECF No. 711-1 at 20, Section XV(c) of the Settlement requires "mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time.")
Dr. Stewart explained at the preliminary injunction hearing that the consequences of this failure are:
[ ] psychiatric decompensation. And then we run into that whole line, you know, acting out, writing up, more segregation time and/or going to crisis, coming out. It's -- the fact that (vi)(A), which is continuation of the initial treatment plan with enhanced therapy, if necessary, to protect from decompensation that may be associated with segregation, that's not being done. People are getting worse in segregation.
(ECF No. 1905 at 174 ).
In addition to the above, during the permanent injunction hearing, there was additional evidence presented regarding inmates' out-of-cell time. In the record it is generally accepted that out-of-cell time for mentally ill inmates in segregation is necessary to avoid a rapid decline in mental health. Plaintiffs argue that the lack of adequate structured out-of-cell time is a continuation of the Defendants' failure to meet their obligation under Section XV(c)
*910 of the Settlement Agreement. Plaintiffs also argue that Defendants are not adequately addressing an inmate's refusal to participate in out-of-cell time.
As it relates to Menard, Pontiac, and Dixon, the "received" and "received minus refusal" structured out-of-cell time by inmates during June 24, 2018, through June 30, 2018, was summarized in Plaintiffs' Exhibits 45B, 45C, and 45D. Plaintiffs presented information regarding these institutions because they have large segregation populations. (See ECF No. 2374 at 124, Dr. Stewart testified that "I know Pontiac has a very large segregation population, but Menard also has a large segregation population."). The evidence showed inmates were receiving an average of 6.05 hours at Menard, 6.97 hours at Pontiac, and 9.3 hours at Dixon. (Pl. Ex. 45B, 45C, and 45D). However, it was noted that "received" hours included those that were taken and offered but refused. Id. The actual average out-of-cell time was 4.24 hours at Menard, 2.996 hours at Pontiac, and 3.13 hours at Dixon. Id. Parenthetically, it should be noted that the majority of structured out-of-cell time was by way of movies. (Pl. Ex. 45A; see also ECF No. 2374 at 126[4] ).
The most significant issue raised by these numbers is the importance of staffing. Dr. Doyle and Dr. Mirsky both testified that refusing group or other mental health services can be a potential indicator of decompensation. (ECF No. 2377 at 48 ; ECF No. 2370 at 276 ). Nonetheless, the record indicates a lack of concern or follow-up for those individuals refusing to participate in these activities.
Mental Health Treatment on Crisis Watch
Like segregation, inmates who are on crisis watch are in isolation and additional care is necessary to avoid exacerbating their mental health issues. Crisis refers to an acute exacerbation of mental illness, such as worsening psychosis or mania, or acting out behaviorally, or when someone is acutely suicidal or potentially violent. (ECF No. 1757 at 51-53 ). The purpose of crisis cells or watches in correctional mental health systems is to, first, protect the individual from self-harm or harming others, and second, to provide appropriate mental health assessment and intervention, such as re-evaluating medication, re-evaluating the psychosocial treatment, and addressing whatever issues precipitated the crisis (ECF No. 1757 at 219 ; see also at 38, Dr. Stewart explained that the crisis level of care is needed to assist "people that are presenting with acute problems that need aggressive intervention to deal with a particular acute issue."). During the preliminary injunction hearing, Dr. Stewart testified that it is "imperative that their treatment is reviewed, not just by one individual but for the entire treatment team that's involved with the case [ ] [a]nd that's not happening." (ECF No. 1757 at 52 ).
The Settlement Agreement provides certain requirements as it relates to crisis treatment. First, the Settlement Agreement provides:
Beds that are available within the prison for short-term (generally no longer than *911 ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilized the offender prior to transfer to a more or less intensive care setting, as required by IDOC Administrative Directive 04.04.102, § II(F)(2).
(ECF No. 711-1 at 3 ).
Dr. Stewart testified at the preliminary injunction hearing that, based on his review, the only treatment that regularly occurs on crisis watches is the daily contact by the MHP, which are confidential sessions at some facilities but take place most often at the cell front. (ECF No. 1905 at 131 ). Dr. Stewart explained that:
But again, as I said, the only thing that occurs is being placed in the cell, having certain property removed, and then getting these daily visits. And so there's no specialized treatment that occurs for people in crisis.
(ECF No. 1903 at 198-99 ) (emphasis added).
The Settlement Agreement also provides:
For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form which will be specifically designed for this purpose by IDOC and approved by the Monitor. This five-day assessment process will be in addition to IDOC's current procedure for Crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from Crisis Watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.
(ECF No. 711-1 at 10 ).
Dr. Stewart concluded that, at the time of the preliminary injunction hearing, Defendants are only conducting the first suicide evaluation, but are not continuing to assess monthly for six months. (ECF No. 1757 at 232 ). Dr. Stewart also opined that the Defendants' failure to conduct necessary evaluations and assessments of those who are discharged from crisis watches results in unnecessary harm and suffering, especially as those failures combine with inadequate treatment planning and psychopharmacology. (ECF No. 1757 at 231 ). There was no evidence to the contrary presented by the Defendants about the conditions at the time of the preliminary injunction hearing. Additionally, evidence regarding crisis watch was presented during the permanent injunction hearing. Most notably, Plaintiffs presented evidence of inmates who were kept on crisis watch longer than 10 days. In June 2018, there were 620 inmates placed on crisis watch, in July 2018, there were 486. (Pl. Ex. 53; Pl. Ex. 43). Of those inmates, 85 were kept on crisis watch longer than 10 days in June, and 121 inmates met that criteria in July. (ECF No. 2374 at 111-12 ; Pl. Ex. 43; ECF No. 2376 at 314, Dr. Renzi's Testimony). The IDOC's Mental Health Procedures Manual provides that "patients who remain on crisis treatment level of care after ten consecutive days will be considered for a higher level of care." (Df. Ex. 49, p. 31). The record reveals little compliance with this requirement.
Moreover, Dr. Mirsky confirmed Dr. Stewart's finding that inmates on crisis watch are getting between 15-20 minutes of time with qualified mental health professionals *912 and little other time. Notably, Dr. Doyle explained:
"[If the IDOC had additional staff] it would mean that we could spend more time. Some people, it takes them a few minutes just to get comfortable sitting with you as a psychiatrist. So we could establish better rapport.
Looking at the reverse as to what the damage is, I'm hoping that we're not doing any damage, but I couldn't say for sure if there isn't some."
(ECF No. 2377 at 81 ).
Mental Health Evaluations
As previously noted, there is no dispute the Defendants have failed to comply with Section V(f) of the Settlement Agreement. Section V(f) provides:
Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral (see IDOC Administrative Directives 04.04.100 § II(G)(2)(b) and 04.04.101 § II(F)(2)(c) ).
(ECF No. 711-1 at 8 ).
There was much evidence regarding the significant backlog in psychiatric contacts with inmates. Contacts are activities that psychiatrists and mental health professionals are supposed to accomplish, including evaluations, treatment plans, and follow-up. (ECF No. 1757 at 212-13 ).
The Defendants argue that the backlog has substantially declined, noting that there is now a backlog of 313 initial evaluations. (ECF No. 1894, Df. Ex. 1a; but see also ECF No. 1757 at 213, where it was noted there was a backlog of 445 evaluations, 780 treatment planning contacts, and 2,785 follow-up visits; compare with Df. Ex. 1). The Defendants further note that a significant amount of these are only delayed 1-14 days. Finally, the Defendants suggest that the record does not identify the number of mentally ill prisoners at the various facilities, and thus, the Court is unable determine how the number of late evaluations at those four facilities compares to the number of mentally ill prisoners at those facilities. (ECF No. 1965 at 14 ). The Defendants' argument that the Court is unable to determine the extent of the problem based solely on the size of the backlog without additional information regarding the population is unpersuasive. Dr. Hinton testified as to the unacceptable nature of the backlog existing at the time of the preliminary injunction hearing. (ECF No. 1758 at 52, et seq. ).
As discussed before, while the backlog number may have been reduced, it is still significant in terms of timing of the reductions, the current level of backlog, quality, and the methods undertaken to reduce the backlog. Supra , pp. 902-04. The current system's reliance on overtime is not viable. Id.
Mental Health Treatment Plans
The treatment plan document plays a very important role in the delivery of mental health care - it guides the treatment of an inmate. (ECF No. 1906 at 106, 113, Dr. Hinton's Testimony; see also 280, Dr. Mirsky acknowledging treatment plans are the most fundamental document in the whole mental health system). The plan is created for each inmate who is diagnosed with a mental illness or receiving mental health care services. (ECF No. 1906 at 112 ). The treatment plan should capture how treatment is ultimately delivered and the goals of treatment. (ECF No. 1906 at 38 ). The IDOC utilizes the treatment plan to make sure that the inmate consents to the treatment. Id.
The Settlement Agreement provides:
As required by IDOC Administrative Directive 04.04.101, § II(F)(2)(c)(4), any offender requiring on-going outpatient, *913 inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.
(ECF No. 711-1 at 9 ).
Plaintiffs have generally argued that the treatment plans are being done in a perfunctory manner that do not facilitate the delivery of mental health services. (ECF No. 1559 at 14 ; see also ECF No. 2406 at 78, "The treatment plans in IDOC are not helpful and do not facilitate the provision of mental health care; the forms are completed more as an administrative requirement and not true treatment planning.").
This Court's May 25, 2018, Order required that "[a]ll class members shall have a treatment plan that is individualized and particularized based on the patient's specific need, including long and short term objectives, updated and reviewed with the collaboration of the patient to the fullest extent possible." (ECF No. 2070 at 41 ).
The evidence at the preliminary injunction hearing makes it clear that the lack of adequate staffing significantly impacts treatment planning. Defendants argue the full record shows the IDOC has made substantial improvements with respect to treatment planning. This includes the use of a revised treatment plan document reviewed and approved by Dr. Stewart. (Df. Ex. 13). The problem arises, however, in the actual completion of the treatment plans. The mental health providers are so overworked that the treatment plans often become perfunctory.
Plaintiffs presented the Court with treatment plans from inmates at Pontiac Correctional Center. (ECF No. 2374 at 180 ). These treatment plans contained identical, or nearly identical, language describing the therapeutic focus, problems, and activity. (See Pl. Ex. 55C, 55G, 55I, and 55M). Dr. Stewart opined:
What I - what I glean from this, in all seriousness, is this is a reflection of how overworked the mental health professionals are, where they are basically cutting and pasting these things because it's just one more requirement they have because they're stretched way too thin. That's how I read this.
These treatment plans are identical. They're basically all worthless. They may apply to one of these people, and there may be some overlap, but come on, the same wording on four different patients?
So, that's why I see this as the mental health professionals - and this confirms, you know, my walking around Pontiac. These people are just really - they're hurting out there, the mental health professionals, because they have so much work, and there's not enough.
(2374 at 188).
Deliberate Indifference
The above demonstrates the Defendants have breached the Settlement Agreement in the five areas advanced by the Plaintiffs. In order to warrant action by this Court, the Court must also find there is a violation of federal law.
To establish an Eighth Amendment violation, Plaintiffs must prove that Defendants have been deliberately indifferent to their serious medical needs, and in this case, their mental health needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle , 429 U.S. at 104, 97 S.Ct. 285 (citations omitted).
An inadequate medical care claim requires a plaintiff to fulfill two elements: (1) the plaintiff "suffered an objectively serious harm that presented a substantial risk to his safety," and (2) "the *914 defendants were deliberately indifferent to that risk." Minix v. Canarecci , 597 F.3d 824, 831 (7th Cir. 2010). The objective element requires that the plaintiff's medical need to be "sufficiently serious." Gutierrez v. Peters , 111 F.3d 1364, 1369 (7th Cir. 1997). The subjective element requires that the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan , 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
To meet the objective prong, the medical need must be one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gutierrez , 111 F.3d at 1373. A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." Gayton v. McCoy , 593 F.3d 610, 620 (7th Cir. 2010). The Seventh Circuit has agreed with other courts in concluding that the "[t]reatment of the mental disorders of mentally disturbed inmates is a "serious medical need." Wellman , 715 F.2d at 272 (citing Ramos v. Lamm , 639 F.2d 559, 574 (10th Cir. 1980) ); Inmates v. Pierce , 612 F.2d 754, 763 (3d Cir. 1979) ; Bowring v. Godwin , 551 F.2d 44, 47 (4th Cir. 1977).
The subjective component requires a plaintiff to "provide evidence that an official actually knew of and disregarded a substantial risk of harm." Petties v. Carter , 836 F.3d 722, 728 (7th Cir. 2016) ; Farmer , 511 U.S. at 837, 114 S.Ct. 1970. In order to establish deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur." Id. , (citing Farmer , 511 U.S. at 842, 114 S.Ct. 1970 ). However, medical malpractice, negligence, or even gross negligence do not equate to deliberate indifference. Johnson v. Doughty , 433 F.3d 1001, 1013 (7th Cir. 2006). See also Estelle , 429 U.S. at 106, 97 S.Ct. 285 ; McGee v. Adams , 721 F.3d 474, 481 (7th Cir. 2013).
The Seventh Circuit has recognized claims of systemic deficiencies in a prison's health care facility as a second category of deliberate indifference claims. Cleveland-Perdue v. Brutsche , 881 F.2d 427, 430-31 (7th Cir. 1989). In case of alleged systemic deficiencies, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." Wellman , 715 F.2d at 272 (citing Ramos , 639 F.2d at 575 ); Phillips v. Sheriff of Cook Cty. , 828 F.3d 541, 554 (7th Cir. 2016), reh'g and suggestion for reh'g en banc denied (Aug. 3, 2016) (Claims of "systemic deficiencies at the prison's health care facility rendered the medical treatment constitutionally inadequate for all inmates, [ ]" plaintiffs must demonstrate that "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."). The Seventh Circuit has concluded "that a clear consensus had been reached indicating that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs." Cleveland-Perdue , 881 F.2d at 431. See Newman v. Alabama , 503 F.2d 1320 (5th Cir. 1974), (affirming a district court decision finding that systemic deficiencies in the Alabama prisons including inadequate staffing, treatment by unqualified *915 personnel, incomplete medical records, and lack of written procedures establishing the duties and responsibilities of the medical personnel.).
There is no dispute that the Plaintiffs suffer from serious medical conditions. (See supra , p. ----, definition of class). The Court has also found above that the Defendants have failed to provide medical treatment as required by the Settlement Agreement in the five areas advanced by the Plaintiffs. The Court also finds that the failure to provide treatment in the above areas puts the Plaintiffs at a significant risk for further injury and severe unnecessary pain and suffering. At the time of the preliminary injunction hearing, this fact was firmly established. Dr. Hinton, Dr. Dempsey, and Dr. Stewart all testified that the conditions in the IDOC, particularly the deficiencies in staffing, created a substantial risk of harm for mentally ill inmates. Supra , p. ---- - ----. These doctors used terms such as "dangerous," "emergent," and "emergency," to describe the situation. Given this evidence, and considering the standard outlined in Wellman , this Court finds the Defendants' inadequate staffing levels creates a systemic problem that has effectively denied the mentally ill inmates access to adequate and constitutionally required care.
It should be noted that Defendants maintain the position that the law requires this Court to limit its decision to the care currently being provided by the Defendants. (ECF No. 2368 at 1 ). The Defendants further maintain any issues concerning the care the IDOC provided in the past are moot and irrelevant to a claim seeking forward-looking injunctive relief. Id. In support of their positions, Defendants note that the Supreme Court has explained that "deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct [ ]." (ECF No. 2368 at 3 ); Helling v. McKinney , 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Defendants further note that a plaintiff pursuing a permanent injunction must demonstrate a continuing need for the injunction "during the remainder of the litigation and into the future," and even if prison officials "had a subjectively culpable state of mind when the lawsuit was filed," they "could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation." Id. ; Farmer , 511 U.S. 825, 846 and n. 9, 114 S.Ct. 1970 (1970).
In Helling , the Plaintiff complained that he was exposed to unreasonably high levels of environmental tobacco smoke due to his cellmate's smoking habits. Id. The Supreme Court found Plaintiff stated a claim, but cautioned that he may have difficulty in proving the objective and subjective factors of a deliberate indifference claim because he had since been moved to a new prison, no longer had a cellmate who smoked, and the state had enacted new policies in effect regarding smoking. Id. Here, much of this case surrounds the Defendants' most recent actions - or actions since the preliminary injunction was issued - to correct significant deficiencies in the delivery of mental health treatment. The Supreme Court and Seventh Circuit precedent require this Court to consider the totality of the circumstances, including the condition as described at the preliminary injunction hearing, the chances of these conditions reoccurring, as well as the current attitude of the Defendants, in considering whether or not a permanent injunction should issue. Additionally, the Court has relied on the fact that the Defendants' actions frequently occur in response to the Court's intervention. See *916 Coleman v. Wilson , 912 F.Supp. 1282, 1311 (E.D. Cal. 1995) (The Court in granting a permanent injunction cited the defendants' history of refusing "to address the serious issues underlying the preliminary injunction until forced to do so under pressure of this litigation.").
Defendants also argue that the problem is no longer systemic but only one that affects a few of the institutions. The Defendants specifically note the weekly backlog report shows that as of August 17, 2018, twelve facilities had no backlog with respect to treatment plans, six facilities had only ten or fewer total backlogs in treatment plans, while another seven institutions had fewer than 40 backlogged treatment plans. (Df. Ex. 1D and DX 1I). There is no doubt the Defendants have been able to reduce the backlogs generally and even substantially at certain institutions. However, the backlog remains a real issue within the IDOC given the significant problems with documentation as well as the widespread use of overtime to handle most of the staffing needs to address the backlog. Moreover, the ability to minimize the backlog at certain locations comes at the cost of providing care in other areas. The Defendants have failed to put forth any long-term sustainable solution to address their staffing needs.
The record also establishes the Defendants knew of, and disregarded, a substantial risk of harm to the Plaintiffs. While the record shows the Defendants have made efforts to address many of the problems associated with the delivery of adequate mental health care, particularly recently, the Court remains concerned with the overall lack of a sense of urgency. As previously noted in this Court's Preliminary Injunction Order, the issues associated with the staffing deficiencies began as far back as 2014 when the Defendants created their own 2014 remedial plan, and at this time, the Defendants have yet to fulfill any of their own staffing requirements. A significant problem with the Defendants' approach is the reliance on Wexford to provide the necessary staffing to fulfill their constitutional obligation. This record demonstrates Wexford has been unable to handle this job, a job the Defendants are unable to delegate to evade their constitutional duties. (See Pl. Ex. 7, p. 2, Wexford long recognized the need to amplify its recruitment efforts). High level officials in the Governor's office have written Wexford "encouraging" them to fill the required positions, yet the staff necessary to provide constitutional care has yet to be hired; nor have the Defendants generally sought to take a different approach. (ECF No. 2354 at 72 ; Pl. Ex. 59, p. 3; see also ECF No. 2354 at 76, Baldwin testified that they depend on their partners for filling the vacancies.). The Court recognizes that the changes needed in the IDOC have been monumental. The Parties also recognized this and entered into a comprehensive Settlement Agreement providing deadlines and budget contingencies. However, the Defendants have failed to meet many of the terms. It is clear mentally ill inmates continue to suffer as they wait for the IDOC to do what it said it was going to do. (See supra , fn. 2). The Court cannot allow this to continue. The Court further finds that there is no adequate remedy at law. The Defendants must provide adequate and constitutionally required care for mentally ill inmates.
Defendants argue the balancing of harms weighs in their favor as Plaintiffs have not met their burden of proof to show the class members are currently facing a sufficiently identified harm in the absence of granting additional prospective relief. The Court disagrees with Defendants' assessment for the reasons stated herein. The Defendants also argue that compliance with a Court imposed order taxes an already over-worked mental health staff.
*917 This argument further demonstrates the need for additional staff.
Given all of this, the Court finds that a permanent injunction must issue in order to ensure the constitutionally required care will be given to the mentally ill inmates in the custody of the Defendants.
In sum, the Court finds that Defendants have been deliberately indifferent to the medical needs of the Plaintiffs in medication management, mental health treatment in segregation, mental health treatment on crisis watch, mental health evaluations, and mental health treatment plans within the meaning of the Eighth Amendment.
The Court further finds the Plaintiffs have established by a preponderance of the evidence that a permanent injunction is appropriate and necessary. The Court specifically finds that the Plaintiffs have suffered or will suffer irreparable injury if a permanent injunction is not issued. There are significant deficiencies in the delivery of mental health services within the IDOC. The evidence establishes that there are systemic and gross deficiencies in staffing that effectively denied the Plaintiffs access to adequate medical care. The Plaintiffs are at a significant risk of harm. The Court further finds that there are no adequate remedies available at law to compensate for these injuries. Plaintiffs are mentally ill inmates incarcerated within the IDOC, and Defendants are required to provide adequate care. The balance of hardships weighs heavily in favor of the Plaintiffs. While appropriately staffing the IDOC with mental health providers is a significant task, it is one that can, and must, be done. The public interest also weighs heavily in favor of the Plaintiffs.
In considering the appropriate remedy, Defendants correctly provide that the Court issued its Order as contemplated under § XXIX(g) of the Parties' Settlement Agreement. (See ECF No. 2460 at 8 ; ECF No. 711-1, Settlement Agreement). Section XXIX(g) of the Settlement Agreement provides:
If the Court finds that Defendants are not in substantial compliance with a provision or provisions of this Settlement Agreement, it may enter an order consistent with equitable and legal principles, but not an order of contempt, that is designed to achieve compliance.
(ECF No. 711-1 at 30 ). This Court also recognizes the restraints for injunctive relief specifically enumerated in the Prison Litigation Reform Act ("PLRA"). In that regard, the PLRA provides:
The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.
18 U.S.C. § 3626(a)(1)(A). This Court is also fully aware that "judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." Rogers v. Scurr , 676 F.2d 1211, 1214 (8th Cir. 1982). Defendants suggest the Seventh Circuit requires the Court "to order IDOC officials to do so in general terms and to verify that the plan they submit satisfies the relevant constitutional standards." See Westefer v. Neal , 682 F.3d 679, 686 (7th Cir. 2012). In Westefer , the Seventh Circuit reviewed a district court's injunctive order addressing the IDOC's procedures when assigning inmates to the supermax prison. The district court incorporated the supermax-transfer regime used in Ohio. In vacating the district *918 court's order, the Seventh Circuit explained:
The district court's injunction goes well beyond this, locking in highly specific formal requirements controlling the timing and content of the notice and hearing that each transferred inmate must receive, and even going so far as to impose a right to appeal. An injunction of this scope and specificity is inconsistent with the "informal, nonadversary" model set forth in Wilkinson [v. Austin , 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ], Hewitt [v. Helms , 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ], and Greenholtz [v. Inmates of Nebraska Penal & Correctional Complex , 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ], and cannot be reconciled with the PLRA's requirement that injunctions in prison-conditions cases must be narrowly drawn and use the least intrusive means of correcting the violation of the federal right.
Id. at 684. Defendants' reliance on Westefer is misplaced for two reasons. First, the record here demonstrates a long history of the Defendants' non-compliance with various terms they had agreed upon. Second, given this history of non-compliance, Defendants' proposal is wholly deficient in addressing their constitutional violations.
The Settlement Agreement was the result of significant negotiations between the Parties over a period of years. Indeed, in October of 2010, the Parties announced in open court that they were working toward a class settlement. The Parties worked with a panel of experts to assist in their settlement efforts. (ECF No. 117, Joint Status Report dated May 7, 2012). A comprehensive settlement conference was held between April 16, 2013, and April 18, 2013. An Agreed Order that provided additional working structure resulted from the settlement efforts. (See ECF No. 132 ). After additional unsuccessful settlement efforts by the Parties, on March 20, 2015, the matter was set for trial. (Minute Entry dated 3/20/2015; see also Minute Entry dated 9/17/2015). On December 17, 2015, the Parties again announced to the Court that a settlement agreement had been reached. (Minute Entry dated 12/17/2015). On May 23, 2016, the last signature was acquired on the Settlement Agreement resolving the decade-long dispute between the Parties. (ECF No. 711-1 at 33 ).
Since the agreement was finalized, Defendants have failed to comply with many of its material terms. (See e.g. ECF No. 1373, First Annual Report dated May 22, 2017; ECF No. 1646, Mid-Year Report dated November 22, 2017; ECF No. 2122, Second Annual Report dated June 8, 2018). While the Monitor has memorialized Defendants' non-compliance, the Defendants themselves have recognized their deficiencies. During the preliminary injunction hearing, Dr. Hinton testified that a significant number of mentally ill inmates were in dangerous situations because there was inadequate staffing at the IDOC. (ECF No. 1758 at 53 ). The danger associated with the inadequate staffing applied to every aspect of mental health treatment examined during the preliminary and permanent injunction hearing. (See e.g. ECF No. 1758 at 319-20, Dr. Hinton acknowledged that it is dangerous to not monitor an individual on psychotropic medication.). In its Orders, this Court specifically found that the Defendants' efforts to comply with the Settlement Agreement (or its own general directives) only came at the time of, or after, the filing of the Plaintiffs' initial Motion. (See id. , see also ECF No. 1559, filed on 10/10/2017). Simply put, the Defendants' actions have been largely reactionary.
Additionally, based on this Court's review, Defendants' proposal falls far short *919 of addressing their constitutional violations. The record is clear that the Defendants know what needs to be done. When presented with yet another opportunity to establish a reasonable proposal to address their constitutional deficiencies, they instead provided a document containing simple generalities. (See ECF No. 2473-1 ). The Defendants' most egregious attempt to cure their constitutional deficiencies is set forth in their proposal regarding mental health staffing. Defendants propose adopting the vague requirement that they have "a staffing plan and achieve a level of staffing that provides sufficient number of mental health staff of varying types to provide class members with adequate and timely evaluations, treatment and follow-up consistent with contemporary standards of care." (ECF No. 2473-1 at 4 ). Yet, Defendants know they are understaffed, and they also know the staffing levels which are necessary to provide adequate care. In fact, Defendants are fully aware of all these deficiencies, as they have both acknowledged the staffing problems at the IDOC.
Moreover, the record contains ample evidence to demonstrate the IDOC is understaffed. (ECF No. 2460 at 13-28 ). The following exchange at the preliminary injunction hearing puts it in simplest terms:
Q. You know today you can't deliver the care-the psychiatric care that is required for the 12,000 patients because you don't have enough psychiatrists?
A. [Dr. Hinton] Correct.
(ECF No. 1758 at 50 ). For his part, Baldwin testified that the IDOC continues to ask Wexford for additional staff. (ECF No. 2354 at 9 ). Despite the Defendants' recognition of their staffing shortage, not enough is being done. As fully detailed in this Court's Order dated October 30, 2018, the Defendants' failure to adequately staff their facilities has led to a number of areas where they have failed to meet the constitutional requirements with respect to the mental health needs of the inmates.
When there is a "concrete showing of a valid claim and constitutionally mandated directives for relief," a court should and must act. Rogers , 676 F.2d at 1214 ; see also Hutto v. Finney , 437 U.S. 678, 687, n. 9, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). "A federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.' " Dayton Bd. of Educ. v. Brinkman , 433 U.S. 406, 420, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). Here, it is clear constitutional violations have already occurred (see ECF No. 2460, ad passim ), and given the general history of Defendants' non-compliance with the Settlement Agreement, their own directives, and the law, their constitutional violations will continue unless this Court acts.
TERMS OF THE INJUNCTION
The Court FINDS for the reasons stated herein that the following relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.
The Defendants John Baldwin, the Acting Director of the IDOC, and Dr. Hinton, the Department's Chief of Mental Health Services and Addiction Recovery Services must:
1. Staffing requirements at the Illinois Department of Corrections
a. Within 90 days of this order, Defendants must employ the additional staff necessary to have the following system-wide levels in the following positions: 7 Site Mental Health Service Directors; 12 Mental Health Unit Directors; sixteen Staff Psychologists;
*920 142.5 Qualified Mental Health Professionals; 102 Behavioral Health Technicians; 54.5 Registered Nurses - Mental Health; 24 Staff Assistants; 85.5 Psychiatric Providers; 1 Director of Nursing - Psychiatric; 5 Recreational Therapists.
i. In order to provide additional clarity on the staffing requirements, the following describes some of the above positions:
1. Site Mental Health Directors will provide guidance, direction, training and clinical supervision to all MHPs, except for psychiatrists within a given facility;
2. Mental Health Unit Directors will function as lead member of a multidisciplinary team, directing and supervising program psychologists and mental health staff, and providing clinical direction, structure and support for the specified unit;
3. Behavioral Health Technicians will assist staff with transporting offenders to group meetings and therapy appointments, oversees some groups, leads community meetings, and participates in activity therapy sessions under the direction of activity therapists. They will also be involved in additional duties as assigned by licensed MHPs. BHTs will be Bachelor level, unlicensed, employees.
4. Mental Health Training Coordinators will be responsible for developing and managing graduate-level students and pre-doctoral and post-doctoral interns.
5. Qualified Mental Health Professional are Licensed Social Workers, Licensed Clinical Social Workers, Licensed Professional Counselors, and Licensed Clinical Professional Counselors; and
6. Psychiatric providers may include the use of mid-level professionals and medical doctors.
b. Within 120 days of this order, Defendants shall evaluate whether their staffing plan is sufficient to provide mental health treatment consistent with constitutional law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health care in segregation, and mental health evaluations;
c. Within 180 days of this order, Defendants shall report their findings and submit a proposed amended staffing plan to the Court, the monitor and Plaintiffs' counsel; and
d. After the report, the Court will consider if any modification to the Defendants' staffing is necessary.
The Court specifically notes that the record is clear additional staffing is needed to provide the constitutionally required mental health services at the Illinois Department of Corrections. Almost universally, every witness who appeared during the hearings, at some point during their testimony, stated that there was insufficient staff to provide the needed mental health care for inmates. (See e.g. ECF No. 1757 at 139, Dr. Stewart testified about the reason for lack of group activities; ECF No. 1757 at 197, Dr. Michael Dempsey testified that there were not enough psychiatrists to treat patients; ECF No. 1758 at 82, Dr. Hinton explained the IDOC did not have the right staffing requirements; ECF No. 2354 at 71-76, Baldwin acknowledged that the IDOC needed to work on staffing; ECF No. 2376 at 356, Kelly Ann Renzi, Ph.D., Psychologist Administrator *921 at Pontiac Correctional Center; ECF No. Dr. Melissa Stromberger, Psychologist Administrator at Hill Correctional Center; but see ECF No. 2373 at 822, Dr. William Elliott, Wexford Health Sources' Regional Mental Health Director for Illinois, who testified that Wexford had the right staffing requirements).
The Court recognizes the amount of staff necessary may not ever be identified with exact precision. Nonetheless, the Court finds that immediate action must be taken by the Defendants to address the dangerous situation that exists in the correctional facilities. The Court finds the 2014 Remedial Staffing Plan is the valuable piece in analyzing the staffing deficiencies within the IDOC. Parenthetically, the Defendants have argued that the 2014 Remedial Staffing Plan is not contained in the record. To the contrary, this document is in evidence. (ECF No. 2362 at 1 ; ECF No. 1757 at 19 ; and ECF No. 1716 at 2, Transcript wherein the document was entered into evidence without objection). The IDOC found the staffing contained within the document was sufficient to satisfy its constitutional violations. (ECF No. 1716, Exhibit and Witness List, Ex. 9, IDOC Proposed Remedial Plan dated April 17, 2014, "Pursuant to its September 20, 2013 Facility and Staffing Plan, the Illinois Department of Corrections ("Department" or "IDOC") is pleased to present this proposal for staffing levels and bed and treatment space allocations that satisfy its constitutional duty to provide mental health care to seriously mentally ill ("SMI") offenders."). Nonetheless, the Plan was provided by the IDOC as part of its self-review to determine what needed to be done to "satisfy its constitutional duty to provide mental health care to seriously mentally ill ("SMI") offenders." (Pl. Ex. 9, p. 1). Couple with the testimony at the hearings referenced in this Order, this Court is convinced the staffing requirements contained therein are, at a minimum, necessary to correct the Constitutional deficiencies currently existing in the IDOC. The Court also recognizes Defendants have increased staffing efforts since the creation of the document leaving the most recent shortfall at: 8 Mental Health Unit Directors; 2.97 Staff Psychologists; 27.5 Qualified Mental Health Professionals; 38 Behavioral Health Technicians; 34.5 Registered Nurses - Mental Health; 35.89 Psychiatric Providers. (See Df. Ex. 5b). Finally, the Court has provided the staffing requirements in the aggregate recognizing that the specific geographical area of need may change, and Defendants must have flexibility to deploy their staffing resources to the appropriate areas.
The Court recognizes this staffing mandate may not be enough. (See ECF No. 2122 at 10, Second Annual Report of Monitor, Pablo Stewart, MD, "It has become painfully clear to the monitoring team over the first two years of the Settlement Agreement that the staffing levels of the Approved Remedial Plan are totally inadequate to meet the mental health and psychiatric needs of the mentally ill offender population of the Department." See also ECF No. 1373 at 35, First Annual Report of the Monitor Pablo Stewart, MD, "Understaffing is very evident at all but one IDOC facility monitored and this was identified as a key reason a number of other Settlement provisions have not been met. Turnover is reported as high."). As such, the Court also directs Defendants to evaluate whether their current staffing plan meets their constitutional obligation. This action, in conjunction with the requirement to immediately increase staff, will allow the Defendants the opportunity to assess their staffing needs while immediately addressing the glaring staffing deficiencies that currently place the class members in danger.
*922 The Court finds that this directive, based on the evidence, is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.
2. Class members who are placed on mental health crisis watch:
a. Crisis watches should only be used for patients exhibiting behavior dangerous to self or others as a result of mental illness and may only be ordered upon a finding by an appropriately trained and licensed mental health professional that no other less restrictive treatment is appropriate. When used, crisis watches are to be employed for the shortest duration possible;
b. IDOC shall provide appropriate mental health treatment to stabilize the symptoms and protect against decompensation;
c. Reevaluations of treatment and medication will occur as needed and mental health treatment shall be determined and any necessary interventions to stabilize individuals shall occur;
d. Daily assessment in a confidential setting of the patient's progress to determine if the patient is moving towards stability, whether other or additional treatments are indicated, or if transfer to a higher level of care is required;
e. No later than at the time of discharge from crisis watch, an appropriate mental health professional (with the patient) shall review and update the treatment plan which will apply after discharge from crisis watch. The updated treatment plan will address causes which led to the deterioration and the plan for risk management to prevent relapse;
f. For anyone who does not stabilize sufficiently to be discharged from crisis watch, the treatment team must establish a plan to provide a higher level of care, which may include transfer to a higher level of care facility, or explain in writing why establishing such a plan is not appropriate; and
g. Out of cell time for confidential counseling and groups, psychiatric care, therapeutic activities, and recreational or leisure activities unless clinically contra-indicted.
In addition to the reasons outlined in this Court's Order dated October 30, 2018, given the Defendants' general failure to address their deficiencies in the care of mentally ill inmates on crisis watch, it is necessary to require the above action. The record demonstrates that crisis watch is often being used in a manner that is detrimental to the inmates. Inmates are initially screened for suicidal tendencies but are not always re-accessed thereafter. (ECF No. 1757 at 232 ; ECF No. 1903 at 198-99, Dr. Stewart testifying that "there's no specialized treatment that occurs for people in crisis."). As such, Dr. Hinton acknowledged that "the primary focus [of crisis watch] is ensuring [inmates'] safety, ensuring that [inmates] are okay and getting [them] off of a state of crisis [ ]." (ECF No. 2371 at 34 ). Dr. Hinton's own testimony highlights the requirement that crisis watch should be used for the shortest duration possible.
Dr. Stewart also opined that the Defendants' failure to conduct necessary evaluations and assessments of inmates who are discharged from crisis watch results in unnecessary harm and suffering, especially as those failures combine with inadequate treatment planning and psychopharmacology.
*923 (ECF No. 1757 at 231 ). The Court finds that the directives related to inmates on crisis watch are narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and are the least intrusive means necessary to correct the violation of the Federal right. The Court has fashioned these requirements being mindful to allow as much operational discretion and flexibility to prison administrators as possible given the record in this case.
3. Class members who are placed in segregation[5]
a. Promptly after placement into segregation, a mental health professional shall assess the class member to establish a baseline against which any future decompensation can be measured. Such review shall be documented in the patient's mental health records in a manner that facilitates access and review by subsequent treatment staff;
b. A mental health professional shall review and recommend any clinically necessary modifications to the prisoner's individual treatment plan;
c. Rounds shall be conducted by appropriate mental health staff, which may include behavioral health technicians;
d. Class members who are in a Control Unit for periods of sixteen days or more shall receive care that includes, at a minimum:
i. Continuation of their mental health treatment plan with such treatment as necessary to protect from any decompensation;
ii. Rounds in every section of each Control Unit at least every seven days by appropriate mental health staff;
iii. Pharmacological treatment (if applicable);
iv. Meeting with MHP or multidisciplinary team meetings to the extent necessary;
v. MHP or mental health treatment team recommendations to post-segregation housing; and
vi. Structured and unstructured out of cell time sufficient to protect against decompensation. Structured out of cell time includes therapeutic, educational and recreational activities that involve active engagement by their participants for the duration of the activity.
e. Class members in any Control Unit for periods longer than sixty days shall be provided with structured and unstructured out of cell time sufficient to protect against decompensation unless clinically contraindicated. If an inmate refuses out of cell time, a MHP shall follow-up with the inmate to determine whether or not there is a risk of further decompensation;
f. Mental health staff shall assess class members in Control Units to determine *924 if a higher level of care is necessary and if so, to make proper recommendations to facility authority; and
g. Continued treatment by mental health professional and/or psychiatric provider to the extent clinically indicated.
In addition to the reasons outlined in the Court's Order dated October 30, 2018, Defendants themselves have recognized that some of the aforementioned directives are necessary. (See ECF NO. 2473-1 at 3-4 ). In addition, three critical points were made during the hearings. First, Dr. Hinton testified that the requirements related to inmates who are in segregation are not being met. Dr. Hinton also testified that, in his view, "there's nothing that is a good thing about being in segregation." (ECF No. 1758 at 82 ). Second, Dr. Stewart testified that the IDOC's medication management for those in segregation is worse than for Class Members elsewhere in the system. Dr. Stewart specifically noted there is a significant problem in ensuring those in segregation who are prescribed psychotropic medication actually take the medication. (ECF No. 1757 at 123 ). And third, Dr. Stewart explained the consequences of failing to allow mentally ill inmates out of cell time as follows:
[ ] psychiatric decompensation. And then we run into that whole line, you know, acting out, writing up, more segregation time and/or going to crisis, coming out. It's -- the fact that (vi)(A), which is continuation of the initial treatment plan with enhanced therapy, if necessary, to protect from decompensation that may be associated with segregation, that's not being done. People are getting worse in segregation.
(ECF No. 1905 at 174 ). Given the testimony at the hearing, the Court finds that its directives related to inmates in segregation are narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and are the least intrusive means necessary to correct the violation of the Federal right. The Court has fashioned the requirements being mindful to allow the most operational discretion and flexibility to prison administrators as possible given the record in this case.
4. Class members who are prescribed psychotropic medication
a. Class members who are prescribed psychotropic medication shall be evaluated by a psychiatric provider at regular intervals consistent with constitutional standards;
b. IDOC shall accomplish the following in psychiatric services:
i. Administer medications to all class members in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to, and taken by, the offenders as prescribed;
ii. The regular charting of medication efficacy and side effects;
iii. Take necessary steps to ascertain side effects;
iv. The timely performance of lab work for these side effects and timely reporting on results;
v. The class members for whom psychotropic drugs are prescribed receive timely explanations from appropriate medical staff about what the medication is expected to do, what alternative treatments are available, and what in general are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication; and *925 vi. That class members, including offenders in a Control Unit who experience medication noncompliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's medication noncompliance said noncompliance remains unresolved, the MHP shall refer the offender to a psychiatric provider.
In addition to the reasons outlined in this Court's Order dated October 30, 2018, the Court notes that the danger of prescribed psychotropic medications was detailed during the hearings. Some of the medication used to treat psychiatric conditions have harsh side effects. (ECF No. 1757 at 241 ). Because of these side effects, monitoring is required. Id. One of the biggest revelations in the hearings was Dr. Stewart's testimony that "[i]t's rare when someone [on psychiatric medication] is being seen every 30 days [I've] [f]ound examples of people being seen -- of medications being routinely written for anywhere from two to six months." (ECF No. 1757 at 243 ). This is a significant problem and one that must be addressed immediately. Given the testimony at the hearing, the Court finds that the directives related to inmates on psychiatric medication are narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and are the least intrusive means necessary to correct the violation of the Federal right.
5. Treatment plans
a. All class members shall have a treatment plan that is individualized and particularized based on the patient's specific needs, including long and short term objectives, updated and reviewed with the collaboration of the patient to the fullest extent possible.
b. Mental health evaluations shall be conducted in a timely manner to ensure that individuals in need of treatment, or re-evaluation of existing treatment, are evaluated without undue delay.
c. Treatment plans shall be reviewed and updated at regular intervals as clinically necessary to assess the progress of the documented treatment goal and update the plan accordingly.
In addition to the reasons outlined in this Court's Order dated October 30, 2018, the Court emphasizes that it found the Defendants failed, in a systemic way, to properly create, update, and monitor the treatment plans. (ECF No. 2460 at 37-38 ; ECF No. 1905 at 80, Dr. Stewart found that in a majority of medical files he reviewed, the treatment plan used boilerplate language and did "not address the treatment needs of a particular mentally ill offender."). Again, this problem has been caused, in large part, by the Defendants' failure to address its staffing needs. The record is clear that treatment plans and evaluations are critical to the mental health care of inmates. As such, the Court finds that the directives related to treatment plans and evaluations are narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and are the least intrusive means necessary to correct the violation of the Federal right.
6. Compliance Requirements
a. A quarterly report created by IDOC shall certify each facility's compliance with the above requirements.
b. On a regular basis (no less than every 90 days), Defendants shall provide the results of their own quality assurance audit. These results shall include an accompanying *926 certification of Defendants' CQI Manager of whether compliance has been reached with Defendants' quality assurance audit requirements.
c. The appointed independent monitor, Dr. Pablo Stewart, will monitor the Defendants' compliance with this Order consistent with the monitor's existing duties and functions.
d. Nothing in this Order relieves the Defendants of their obligations under the Settlement Agreement.
7. Timing
The terms of this permanent injunction shall remain in place for a period of two years from the date of this Order. See supra p. 899; see also e.g. 711-1 at 30.
FINAL COMMENTS ON REMEDY
During the preliminary injunction hearing, Defendants did not generally dispute their deficiencies in mental health care to inmates. (See ECF Nos. 2070, Order dated 5/25/2018, see also ECF Nos. 1757, 1758, 1903, 1904, 1905, and 1906, transcripts of preliminary injunction hearing). During the permanent injunction proceeding, Defendants' evidence was focused on changes that had occurred between the issuance of this Court's Preliminary Injunction Order and the permanent injunction hearing. (See ECF No. 2460, Order dated 10/30/2018; ECF Nos. 2370, 2371, 2372, 2373, 2374, 2375, 2376, 2377, and 2378, transcripts of the permanent injunction hearing). However, Defendants also assert they are doing the best they can considering the market for mental health professionals. These positions are contradictory and problematic. The former highlights the fact that Defendants fail to act urgently without the Court's intervention. As noted in this Court's Order dated October 30, 2018, the Defendants have made some strides since the preliminary injunction hearing. In fact, during the permanent injunction hearing, Baldwin boasted about new avenues for staffing, including working with universities. Yet, exploring these opportunities has only recently occurred. The latter is a problem because the Defendants have far too often relied on their outside vendor for their staffing needs. Baldwin made this point clear during the hearing when he testified:
Q. And so in January you knew that you were not providing the level of care desperately needed and to which these people are entitled?
A. We knew we had a problem, and we were working on a broad front to help address it. And we still are and will continue.
Q. But you can't tell me how it came to be that you had such a terrible problem in January of 2018 when you had made promises in May of '16 that, if they had been kept, wouldn't let you be in that situation, right?
A. Yes. We need to do -- we depended on our partner for filling vacancies.
Q. You depended on your partner -- Wexford -- to deliver care that you had promised? Is that what you're saying?
A. That's part of it. We also trained staff. We also hired our own behavioral health people in good numbers. And we have made, in my opinion, a reasonable effort to comply in most areas of the treatment for the mentally ill under our care.
(ECF No. 2354 at 76-77 ) (emphasis added).
In the end, it was the Defendants' decision to rely on Wexford to solve their problem. As this Court noted previously, the Defendants cannot shirk their constitutional obligations by delegating them to another. (ECF No. 2460 at 44 ). And now the Court must impose the directives *927 above to avoid the continuance of the constitutional violations.
Parenthetically, several times in their briefs and associated oral arguments, Defendants have noted that this Court has left the Settlement Agreement in place. While it is true the Court has found the Settlement Agreement remains, the reason for such is simple - the Parties agreed to do so. (See e.g. 711-1 at 30, "If the Court determines that Defendants are not in substantial compliance, with any provision of this Settlement Agreement at any time during the three (3) year period of the Settlement Agreement, the Court's jurisdiction with respect to such provision shall continue for the remainder of the three (3) year period or for a period to be ordered by the Court of not more than two (2) years from the date of the Court's finding that Defendants are not in substantial compliance."). The Parties agreed to litigate certain portions of their dispute if compliance with the agreement did not occur - and only those portions were litigated. With respect to those areas, the Court has found Defendants were not in substantial compliance. The requirements imposed herein are those the Court finds are narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and are the least intrusive means necessary to correct the violation of the Federal right.
So ordered, this 22nd day of April 2019.

It should be noted that Dr. Stewart also explained that inmates in segregation are:
[ ] some of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely.
And so -- you know, and they get nothing. Couple little things thrown at them. But they really don't get any sort of regular treatment.
And so this is a real serious issue, you know. I don't want to put a number on it. It's, it's -- it's as serious as I've seen.
(ECF No. 1905 at 182-83 ).

Dr. Stewart testified about the use of movies as a structured treatment activity:
It certainly would -- it could contribute to lessening the decompensation, but I don't -- it's not a -- necessarily a therapeutic activity, so I would question its validity for that purpose.
I think it's a good thing to get people out of their cells and doing anything. I want to be real clear about that.
(ECF No. 2374 at 126 ).

Dr. Stewart has explained that inmates in segregation are:
[S]ome of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely.
And so -- you know, and they get nothing. Couple little things thrown at them. But they really don't get any sort of regular treatment.
And so this is a real serious issue, you know. I don't want to put a number on it. It's, it's -- it's as serious as I've seen.
(ECF No. 1905 at 182-83 ).